William A. CALTHORPE, Mona M. Calthorpe, Joseph H. McLellan and Catherine M. McLellan

v.

Ernest P. ABRAHAMSON, Jane S. Abrahamson, Manley A. Dyer and Fannie G. Dyer.

Supreme Judicial Court of Maine.

Argued Jan. 4, 1982.

Decided Feb. 12, 1982.

Drummond, Woodsum, Plimpton & MacMahon, P.A., John A. Graustein (orally), Richard A. Spencer, Portland, for plaintiff.

Robinson & Kriger, P.A., Robert C. Robinson (orally), Portland, for defendant.

Before McKUSICK, C. J., GODFREY, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ., and DUFRESNE, A.R.J.

WATHEN, Justice.

Plaintiffs in this case, Joseph and Catherine McLellan and their daughter and son-in-law Mona and William Calthorpe, brought suit in 1976 against defendants Manley and Fannie Dyer and Ernest and Jane Abrahamson, praying for declaratory relief with respect to a boundary dispute.

The case was first heard by a referee in the latter part of 1978 and his report, filed on January 4, 1979, found in part for plaintiffs and in part for defendants. The Superior Court order entering judgment and accepting the findings of the referee was the subject of an appeal, *Calthorpe v. Abrahamson*, Me., 423 A.2d 231 (1980).

On appeal a remand was ordered since the referee's report failed to fix the location of the entire common boundary line of the parties. Following resubmission the referee amended his report to read in full:

> Commencing at a bolt in the ledge near the shore of Casco Bay which point is six (6) rods from the southwesterly line of land of Dyer (said point being marked No. 6 on Plaintiff's Exhibit # 6 and on Defendants' Exhibit C); thence north forty-seven degrees, fifty-one minutes west (N 47° 51′ W) two hundred sixty and twenty-seven hundredths (260.27) feet to a bolt in the ledge at a point three (3) rods from the southerly corner of land of Abrahamson; thence north thirty-six degrees west (N 36° W) one hundred (100) feet to an iron pin set in the ground; thence on the same course one hundred (100) feet to land now or formerly of one Wesley E. Doughty.

The Superior Court, Cumberland County, granted plaintiffs' motion for acceptance of the referee's report and entered judgment. Defendants appealed and plaintiffs have cross-appealed. The sole issue on appeal is whether the referee erred in determining the location of the boundary between plaintiffs' and defendants' property.[1] Defendants contend that the referee should have found that the boundary was a straight line running from point 6 to point 5.[2] Plain-

---

1. The Calthorpes and Abrahamsons' claims are solely dependent on the resolution of the boundary line between the Dyers and McLellans, except that the Abrahamsons have uncontested title to a lot bounded on the attached diagram by points 7 to 8 to 9 to 10 and back to

7, since each party is claiming record title through conveyances from their co-party.

2. The points referred to correspond to those in Appendix A, a diagram accompanying this opinion. We have chosen to refer to the diagram appended herein in order to simplify the

tiffs, in their cross-appeal, claim that the referee erred in locating the starting point of the boundary at point 6 rather than point 3.

## I.

The plaintiffs in this case claim title by a deed dated November 5, 1954, which contains a description as follows in pertinent part: "Bounded on the North by land of Malcolm McIntosh, on the East by land of Cecil Mansfield, on the South by Casco Bay and on the West by land of Manley A. Dyer ...." The deed to plaintiffs' grantor, Mary James, contains the same description and also states that the parcel contains "two acres, more or less, together with the buildings thereon." Plaintiffs trace their title to an 1881 warranty deed which describes the land as two acres, more or less, being what the grantor then lived on. None of the deeds in the chain of title define the boundaries by natural monuments, distances, or courses.

Defendants claim title by a deed dated September 30, 1940, which contains the following description:

Beginning at the Eastern corner of land formerly owned by Stephen Bennett now owned by Sidney Doughty; thence South thirty-six (36) degrees East along an old stone wall to the seashore at a point approximately thirty-six (36) feet Southwest of the side of Casco Bay Wharf; thence *Northeasterly by the shore about six (6) rods to a bolt hole in a ledge at the Southerly corner* of land of Herbert Doughty; thence North fifty-two (52) degrees West along the line of said Doughty to land of Sidney Doughty; thence South forty (40) degrees thirty (30) minutes West by said Sidney Doughty land to the point of beginning. Said premises are the same which Lizzie Tozier attempted to convey to Kattie C. Westman

by deed dated May 1, 1886 and recorded in Cumberland Registry of Deeds in Book 555, Page 238, *in which deed appears an error in description so that said lot as therein described appears to be but three (3) rods wide.*

Excepting from the above described premises a certain lot and right of way conveyed by Kattie C. Westman to Ida L. Griffin by deed dated July 14, 1900 and recorded in said Registry in Book 703, Page 13.

(emphasis added) The same description is contained in a deed from the heirs of Alonzo Dyer to Manley Dyer and in a deed executed in 1930 from Eben Tozier to Alonzo Dyer. Prior to 1930, the description of the property was substantially different. The parties traced the description to a deed from Stephen Doughty to William Miller, dated November 23, 1864, which read:

bounded beginning at the Eastern corner of land owned by Stephen Bennett, thence South 36° East to the shore, thence North easterly, by the sea shore, *about three rods*, to a stake and stones, thence South 52° West, to the said Bennett's line thence South 4° 30' West three rods to the point of beginning.[3]

(emphasis added) The three rod distance was first deemed erroneous in 1930.

"The cardinal rule in the interpretation and construction of deeds, as in the case of any contract, is to seek to ascertain the intention of the parties." *Sargent v. Coolidge*, Me., 399 A.2d 1333, 1344 (1979); *C Company v. City of Westbrook*, Me., 269 A.2d 307, 309 (1970). Construction of the language of a deed is a legal question, and is reviewed as a matter of law. *Kinney v. Central Maine Power Co.*, Me., 403 A.2d 346 (1979). However, the referee's findings of fact as to the location of the boundary will not be disturbed on appeal unless clearly erroneous. *Hodgdon v. Campbell*, Me., 411

task of describing the land in question. The diagram, while not drawn to scale, has been provided to the Court with the briefs and is adequate for this purpose.

3. The line designated as "South 4° 30' West" was referred to as "South 40° 30' West" in all deeds after 1888. The property was conveyed three times between 1869 and 1888.

A.2d 667 (1980). This case involves questions of law concerning the intentions of the parties; and questions of fact as to whether the plaintiffs "acquiesced" in the defendants' alleged possession of the parcel.

## II.

The dispute concerning the meaning of the deeds centers on the discrepancy in the language defining the distance of the shoreline boundary. Plaintiffs contend that the 1864 deed is accurate, and that the distance on the shore to the northeast mark is therefore three rods. Defendants point out that their source deeds define the *course* of the northeast line as N 52° W, which, if run from a starting point only three rods from the southeast boundary, would render the deed description meaningless. The corresponding boundary of plaintiffs' parcel is defined only as the "land of Manley Dyer", so the boundaries of both parties' parcels can be established by determining the starting point and location of the Dyers' northeasterly line.

The Superior Court accurately analyzed the legal issue of what the predecessors of the parties intended the distance of the shoreline boundary to be, as ascertained primarily from the language of the relevant deeds, and we affirm the finding that the defendants own only three rods frontage on the water. The Superior Court reasoned as follows:

The record of defendants' title until 1930 clearly and only shows a three rod wide strip. In 1900, Katie Westman, one of defendants' predecessors in title conveyed to Ida L. Griffin ... a lot three rods by 100 feet out of the middle of the premises, leaving a lot on the frontage and a lot on the back of the strip. The Griffin deed also granted a right of way to the shore and reserved a right of way to the back lot. The Griffin deed bounds the lot on the east by one of plaintiffs' predecessors in title. This deed of a part of the premises unequivocally shows the understanding of Katie Westman that this part of her whole lot was a three rod strip, otherwise there was no need to describe the out sale as three rods bounding on the east by plaintiffs' predecessors in title and to grant and reserve rights of way to the two remaining parts. In other words she clearly recognized she needed access to the back lot as there was no remaining land on either side of the out conveyance. The Griffin lot is now the lot of defendants Abrahamson. ... The boundary line found by the referee runs to the southeast corner of this lot from the bolt in the ledge at the shore.

.    .    .    .    .

The referee rejected [defendants' claim to a six rod wide lot and plaintiffs' claim that defendant had only a three rod lot] and found the lot to be six rods wide at the shore and the common boundary running back from the shore to the southeast corner of the Griffin lot (now Abrahamson) located three rods from the agreed westerly line of defendants and thence 200 feet northerly, roughly three rods parallel with defendants' west line, to the land of a third party.

I interpret the referee's report as finding that the defendants' lot was in fact a three rod strip. . . .

We hold as a matter of law that the Dyers own a parcel of land which is only three rods wide at the seashore. The fact that in 1930 one of defendant's predecessors' in title, Eben Tozier, unilaterally attempted to increase substantially the size of the lot does not alter our finding. A grantor can convey effectively by deed only that real property which he owns. *See May v. Labbe*, 114 Me. 374, 96 A. 502 (1916); 6 G. Thompson, *Commentaries on the Modern Law of Real Property* § 2935 (1962). There is nothing in the record to suggest that Eben Tozier received title to or possessed anything but the three rod strip. Therefore, he could not, simply by the act of drawing up a deed with a new description of the property, convey to his grantee, Al-

onzo Dyer (Manley Dyer's predecessor in title), good title to a parcel six-rods in width.

▮ There remains the question of what the boundary is between the plaintiffs' and defendants' property. The Dyer line, which is determinative, begins at a point three rods distant along the shoreline from the southerly boundary of the Dyer's land (which boundary has not been disputed on appeal and extends from point 1 to point 2). We find the following two facts of persuasive significance in determining what the boundary is. First, six instruments of conveyance prior to the 1930 deed in defendants' chain of title describe the western border of defendants lot as three rods in length. The 1930 deed which introduces the six rod language as the distance of the shoreline for the first time fails to include the language defining the border opposite the shore as spanning three rods. Second, the surveyors called as witnesses testified that the boundary was intended to be a straight line. Defendants argue in their brief that "the boundary line should be a straight line and it should terminate at the . . . Doughty property line." We agree, and find that the parties originally intended that the boundary should run in a straight line from a point three rods from the southeast corner of the Dyers' lot to a point three rods from the southwest corner of the lot (on the appended diagram, this line thus runs from points 3 to 4). There can be no other rational interpretation of the language of the relevant deeds.

### III.

The referee and the Superior Court found that although the defendants held title by deed to only a three rod parcel, they "gained an extra triangular lot of land (with a base of three extra rods on the shore) by use and occupation acquiesced in since 1888." Both parties have challenged this finding as clearly erroneous. Since acquiescence is a question of fact, 6 G.

Thompson, *Commentaries on the Modern Law of Real Property*, § 3036 at 526 (1962), we will not disturb the referee's finding below unless clearly erroneous. *See Hodgdon v. Campbell*, Me., 411 A.2d 667 (1980); M.R.Civ.P. 52(a).

▮ This Court has in the past recognized that a boundary between adjoining landowners may be established by what is termed "acquiescence." *See, e.g., Milliken v. Buswell*, Me., 313 A.2d 111, 118 (1973); *Borneman v. Milliken*, 123 Me. 488, 124 A. 200 (1924); *May v. Labbe*, 114 Me. 374, 96 A. 502 (1916); *Proctor v. Libby*, 110 Me. 39, 85 A. 298 (1912); *Knowles v. Toothaker*, 58 Me. 172 (1870). Acquiescence is sometimes confused with the rule of practical location by parol agreement. While "[i]t is evident that the precise meaning of [acquiescence] . . . is as elusive as practical location by parol agreement," the two concepts can be distinguished. Browder, "The Practical Location of Boundaries," 56 *Mich.L.Rev.* 487, 504 (1958). This case does not involve the application of the rule of practical location which can be defined as:

Where adjoining owners deliberately erect monuments, fences, or make improvements on a line between their lands on the understanding that it is the true line, it amounts to a practical location. . . . A practical location may be along a wrong line, and either of the parties so making may be estopped to claiming to the true line, especially when acquiesced in over a long period of years.

H. Skelton, *The Legal Elements of Boundaries and Adjacent Properties* § 322 at 362–63 (1930). The distinguishing feature of acquiescence is that proof of an agreement to locate and fix a boundary on a certain line is not required. *Id.* at § 323; G. Thompson, *supra* at § 3036; Browder, *supra*, at 507. As one commentator has stated:

Boundary by acquiescence was originally an extension of boundary by agreement. The doctrine applied in cases where although neighboring owners had recog-

nized a boundary line for a long period of time, they could not show that they had ever agreed on the boundary's location. Once the elements of the doctrine were established, the court presumed that the parties at some earlier time had entered into an express agreement to establish the line.

Comment, "Boundaries by Agreement and Acquiescence in Utah", 1975 *Utah L.Rev.* 221, 224.

Many of the cases in Maine which mention "acquiescence" are concerned with the alleged existence and/or enforceability of an express agreement to establish a boundary in a particular location which is not in accord with the deed. *See, e.g., Milliken v. Buswell*, Me., 313 A.2d 111 (1973); *Bemis v. Bradley*, 126 Me. 462, 139 A. 593 (1927); *Faught v. Holway*, 50 Me. 24 (1861); *Moody v. Nichols*, 16 Me. 23 (1839). In the instant case, we are not confronted with an allegation that an agreement was ever made; rather, this case presents a type of acquiescence which this Court declined to recognize or reject in *Borneman v. Milliken*, 123 Me. 488, 124 A. 200 (1924). In *Borneman*, there was no evidence of "laying out or establishing a boundary, [i.e. practical location by parol agreement] but at most only of recognizing and acquiescing in a certain boundary [i.e. acquiescence]." The Court further stated "that long continued recognition, acquiescence and occupation [in some jurisdictions] imply a tacit agreement, as binding as an express one, . . . as a matter of public policy to prevent the unsettling of established lines." *Id.* at 494, 124 A. 200.

█ The party relying on the establishment of a boundary by acquiescence has the burden of proving the elements of the claim. *See Fuoco v. Williams*, 18 Utah 2d 282, 421 P.2d 944 (1966); *Rickheim v. Boden*, 369 Mich. 150, 119 N.W.2d 620 (1963). The proof of acquiescence must be clear and convincing since recognition of such a boundary has the effect of transferring ownership of the disputed property without requiring compliance with the Statute of Conveyances. *Cf. Hobson v. Panguitch Lake Corp.*, 530 P. 792 (Utah 1975). From a review of the decisions on the subject of acquiescence the following requirements emerge. The defendant in this case must show (1) possession up to a visible line marked clearly by monuments, fences or the like; (2) actual or constructive notice to the adjoining landowner of the possession; (3) conduct by the adjoining landowner from which recognition and acquiescence not induced by fraud or mistake may be fairly inferred; (4) acquiescence for a long period of years such that the policy behind the doctrine of acquiescence is well-served by recognizing the boundary.

█ Applying this rule to the case at hand, we find that the defendants clearly failed to sustain their burden of proof of acquiescence. Defendants never alleged that the diagonal line found by the referee to be the appropriate boundary was a visible line in which the plaintiffs acquiesced. Assuming, however, that the defendants did attempt to prove acquiescence at least up to that line, if not to their alleged boundary running from points 5 to 6 on the appended diagram, we find that the court below erred in finding that the plaintiffs had acquiesced in any boundary.

The defendant introduced evidence suggesting that for forty or fifty years prior to 1974 a henhouse and an outhouse originally erected by one of defendant's predecessors in title had been situated very near the line marked by points 5 to 6, apparently north of the Dyer house. The house itself, erected in the 1930's was built partially on the disputed strip. However, in as much as Mr. Dyer testified that only the southeast portion of the house was built on his predecessor's foundation, the portion of the house on the disputed strip does not conform to the original occupation of the land. A fishhouse, apparently some sort of shed-like structure, now sits in the triangular parcel on the seashore. Both parties admitted that up until approximately ten years ago, they did not know the boundaries of their

parcels and had never agreed on the location of their common boundary. Each family sporadically used and mowed the grass on parts of the disputed property.

The record is devoid of evidence suggesting that a definite boundary was established at any time or at any location. This case differs from the typical dispute involving the significance of a fence or some other structure commonly used to indicate a boundary line. The erection of a fishhouse on the seashore simply does not indicate where the boundary was meant to be. Plaintiffs cannot acquiesce in a boundary they cannot identify with certainty. *See, e.g., Fuoco v. Williams*, 18 Utah 2d 282, 421 P.2d 944 (1966); *D. H. Peery Estate v. Ford*, 46 Utah 436, 151 P. 59 (1915); *Scott v. Slater*, 42 Wash.2d 366, 255 P.2d 377 (1953). The location of the Dyer home is similarly insignificant in locating a claimed boundary.[4]

We reverse the Superior Court decision so far as it finds the boundary between the

4. We are not called upon to decide and we intimate no opinion upon claims of trespass or

parcels to begin at a point six rods along the shore and to run North 47° 51′ West to the Abrahamson parcel. We therefore decide that the boundary is as follows:

Commencing at a point three (3) rods from the southwesterly line of land of Manley and Fannie Dyer; thence North 36° West to a bolt in the ledge at a point three (3) rods from the southerly corner of land of Ernest and Jane Abrahamson; thence North 36° West two hundred (200) feet to land now or formerly of one Wesley G. Doughty.

The entry is:

Appeal denied.

Cross appeal granted.

Judgment reversed in part and remanded to the Superior Court for entry of judgment declaring the boundary in a manner consistent with the opinion herein.

All concurring.

adverse possession.

APPENDIX A

KEY

— boundaries

━ boundaries determined by Referee

- - - - alleged boundaries