1998 ME 22

Mary A. STEINHERZ

v.

Richard D. WILSON.

No. Yor–96–723.

Supreme Judicial Court of Maine.

Submitted on Briefs Sept. 16, 1997.

Decided Jan. 28, 1998.

John C. Bannon, Murray, Plumb & Murray, Portland, for plaintiff.

Alan E. Shepard, Hodsdon, Read & Shepard, Kennebunk, for defendant.

Before WATHEN, C.J., and ROBERTS, CLIFFORD, RUDMAN, DANA and LIPEZ, JJ.

CLIFFORD, Justice.

[¶ 1] Richard D. Wilson appeals from a judgment entered in the Superior Court (York County, *Brennan, J.*) in favor of Mary A. Steinherz. Wilson contends that the court erred in its determination of the location of the boundary line between his lot and the lot belonging to Steinherz. The court located the line according to a survey made after the conveyances to Wilson and Steinherz. Wilson contends that the language in his deed requires that the boundary line must be located on the face of the earth by reference to the recorded plan of the Brooks Farm Subdivision. Because the boundary recognized by the court was one created by parol agreement, and was binding on the parties, we affirm the judgment, although on grounds different than those relied on by the Superior Court.

[¶ 2] Wilson and Steinherz both purchased their adjacent lots from Jonathan Milligan. Wilson owns Lot 3, and Steinherz is the owner of Lot 3B as identified on a subdivision plan. The perimeter of the tract was

surveyed by Roland Libby in 1905 using boundary monuments. Its 40 individual lots, however, were superimposed on the tract between 1905 and 1961 by an unknown drafter, apparently without being surveyed. In 1961 Milligan hired surveyor Thomas Ober to prepare a recordable plan of the Brooks Farm Subdivision. Without the benefit of a field survey, Ober transposed a map that had distance and course data onto a map that had only lot lines. The resulting subdivision plan was recorded in 1961. During this process and in Ober's presence, Milligan drew a line on the map through original lot 3, without using a stated length, compass course, or survey markers. This purported to create the lots in dispute: 3 and 3B.

[¶ 3] No actual survey of any individual lot was done until its sale, resulting in what is known as a "paper" or "protracted" subdivision.[1] Milligan hired Ober beginning in 1962 to survey a number of the lots sold in conjunction with the sales.

[¶ 4] As he surveyed lots, Ober found numerous inconsistencies between the angles, equations, and distances shown on the Brooks Farm plan and the location of landmarks on the face of the earth. He reconciled these inconsistencies using a "best-fit" approach, retaining consistent data while revising inconsistent data in order to fit each lot within the perimeter boundaries of the Brooks Farm plan.

[¶ 5] Wilson purchased lot 3 from Milligan in 1980 by a deed that referenced the Brooks Farm subdivision plan.[2] Wilson looked at the land with Milligan for fifteen to twenty minutes prior to purchase. Milligan did not testify at trial, but Wilson testified that Milligan showed him a high point of land with an old foundation, and told him that the foundation area was on his side of the boundary. Wilson testified that he "didn't know exactly where [the boundaries] were." The Brooks Farm subdivision plan referenced by Wilson's deed also appeared to depict a structure on lot 3. Milligan and Wilson agreed before the conveyance that Milligan would have Ober mark the boundaries of lot 3 on the face of the earth, including the boundary line between lots 3 and 3B.[3] Ober did not mark that boundary line immediately after the Wilson purchase, however. It was not until 1982, in conjunction with Steinherz's purchase of her lot, that Ober surveyed and marked that boundary line.

[¶ 6] Steinherz purchased lot 3B from Milligan in 1982. Her deed description also referred to the recorded plan. Steinherz made placement of precise boundary markers at Milligan's expense prior to closing an express condition of the contract.[4] Ober surveyed lot 3B for Milligan in the summer of 1982. That survey located the boundary line between 3B and 3. Steinherz then hired an architect to begin the building process. When the architect found discrepancies between the Brooks Farm subdivision plan and

---

1. This method contrasts with the layout of a subdivision *after* a survey is completed and boundary markers have been laid down, which allows the lots to be conveyed with metes and bounds descriptions.

2. The Milligan to Wilson deed contained the following description:

   A certain lot or parcel of land with any improvements thereon, as more fully delineated on "Plan of the Brooks Farm at Cape Porpoise", dated 1905, made by R.W. Libby, Engineer, Saco, Maine, and recorded in the York Registry of Deeds, Plan Book 33, Page 7, said lot being *LOT NO. 3*, as show on said Plan, to which Plan reference may be had for a more complete description.

3. Wilson testified on direct as to pre-conveyance discussions about the survey:

[Milligan] stated to me there is not any actual physical markers on the land, but with my purchase he would have, have the markers put in, that was agreed upon, that that would be a part of the, the closing price, you know, that was included in the purchase of the land.... Milligan also responded in writing to Wilson's post-conveyance inquiries twice in 1980 telling him that he would have Ober "put corners down."

Wilson testified:

Q. That is to say, there is no question but that you did ask him to set the pins?
A. I asked Mr. Milligan to set the pins, yes.
....
Q. And you had no objections to Mr. Milligan's using Tom Ober to survey your lot did you?
A. No, I did not.

4. Steinherz was 71 years old at the start of trial. She had experience as a real estate broker.

Ober's surveyed boundary lines, Ober did a second survey. The second survey confirmed to Ober that Steinherz's land included much of the disputed high point of land and the old foundation. On that basis Steinherz had her house built near the old foundation, which her contractor filled and graded. No improvement has ever been made to Wilson's lot.

[¶ 7] Shortly after Steinherz's house was completed in May 1983, Wilson, who is a resident of Massachusetts, visited his lot. Upon seeing the house, he expressed to Steinherz that he thought his boundary was further up the knoll, and asked her for a plan for her lot. Wilson later requested information from Milligan, who verified that the boundary was essentially as Ober had surveyed it, and as evidenced by the distinct tree line that Ober cut and that Steinherz has maintained since 1983.

[¶ 8] Wilson took no action until 1988, when he learned that Middle Branch Engineering (MBE) had done a systematic survey of the entire subdivision to resolve numerous inconsistencies between the Brook Farm subdivision plan and the surveys of individual lots that had been done "piecemeal" over the years. The MBE survey, commissioned by prospective developers of some of the lots, was a mathematical construction of how the 1961 Brooks Farm subdivision plan would appear if projected on the ground. The MBE survey concluded that the Steinherz house had been built on lot 3, Wilson's lot. Wilson purchased the MBE survey and recorded it. Steinherz then brought this action to quiet title and, because of the recording of the MBE survey, for slander of title. Wilson counterclaimed for trespass and sought an injunction to remove Steinherz's house. Noting the fact that the description in Wilson's

deed does not "precisely locate the boundary on the face of the earth," and that Wilson at least implicitly agreed to have Ober work the boundary between lots 3 and 3A, the court concluded that the boundary worked by Ober in 1982 became the legal boundary.[5] The court entered judgment for Steinherz on her quiet title action and for Wilson on Steinherz's claim for slander of title.[6] It decided in favor of Steinherz on Wilson's counterclaim. Wilson then filed this appeal.

[¶ 9] Wilson contends that the issue is one of law. He notes that his deed refers to a recorded subdivision plan with specific dimensions and landmarks, and that his deed identifies his land by lot number. He contends that even though the boundary line between lots 3 and 3B on the plan shows no course distance or monument, nevertheless that line can be located on the face of the earth, the MBE survey determines its true location, and he cannot be divested of the land within that boundary. We disagree.

[¶ 10] The court recognized the boundary established by Ober as being the true boundary between Wilson's lot 3 and Steinherz's lot 3B. The court explicitly found that Wilson and Milligan agreed that Ober would survey the boundary between lots 3 and 3B, and that there was a similar agreement between Milligan and Steinherz. Those findings are amply supported in the record. Ober in fact conducted such a survey and located that boundary, which had theretofore been both unsurveyed and ambiguous. Accordingly, pursuant to the agreement Wilson had with Milligan, albeit delayed until the Steinherz purchase, Ober's survey established that boundary. Once established, the legal effect of the boundary so established was not diminished by the later MBE survey.[7] Al-

5. The court also relied on what it referred to as the "common grantor" theory. *See Hall v. Pickering*, 40 Me. 548, 554–55 (1855). The court rejected theories of establishing the boundary by practical location, *see Calthorpe v. Abrahamson*, 441 A.2d 284, 288 (Me.1982) and acquiescence, *id.* at 289. The court also considered it significant that Ober's survey was the first to mark the common boundary with precision. *See Adams v. Hoover*, 196 Mich.App. 646, 493 N.W.2d 280 (1992) (citing *Diehl v. Zanger*, 39 Mich. 601 (1878) (Cooley, J.) (Cooley doctrine provides that original survey has priority over later surveys)).

6. The court concluded that Wilson did not act with malice toward Steinherz, but rather had a good faith colorable claim to the disputed property.

7. The surveyor who testified as an expert for Wilson conceded that the Ober survey was not inherently wrong, but that MBE had merely used a "better" but not necessarily more accurate approach.

though the trial court did not rely precisely on the doctrine of the establishment of a boundary by parol agreement, nevertheless its findings that Wilson agreed to have Ober survey and determine the boundary between the lots lead to the application of the doctrine. Steinherz is the beneficiary of that agreement.

[¶ 11] We have previously recognized boundaries by parol agreement. *Bemis v. Bradley,* 126 Me. 462, 464, 139 A. 593 (1927) ("It is a familiar and well settled principle of law that a boundary line may, under certain circumstances be established by parol agreement of adjoining owners."). *See also Ames v. Hilton,* 70 Me. 36, 46 (1879).

[¶ 12] Although Wilson had only an oral agreement with Milligan that Ober would survey the boundary, a written agreement is not necessary:

> A contract between owners of adjoining tracts of land fixing a dividing boundary is within the Statute of Frauds but if the location of the boundary was honestly disputed the contract becomes enforceable notwithstanding the Statute when the agreed boundary has been marked or has been recognized in the subsequent use of the tracts. Restatement (Second) of Contracts § 128(1).

[¶ 13] The reason that a parol agreement regarding an unascertained, uncertain or disputed boundary falls out of the Statute of Frauds is that "no estate is created [and] . . . the coterminous proprietors hold up to it by virtue of their title deeds, and not by virtue of a parol transfer of title." *Osteen v. Wynn,* 131 Ga. 209, 62 S.E. 37, 39 (1908). *Cf. Piotrowski v. Parks,* 39 Wash. App. 37, 691 P.2d 591, 596 (1984) (oral agreement valid if parties designate a visible boundary); *Foster v. Duval County Ranch Co.,* 260 S.W.2d 103, 109–10 (Tex.Civ.App.– San Antonio 1953) ("where parties are in doubt as to where the true division line between them of their lands may be, they may fix it by parol agreement which would be mutually binding on them, even though they

were mistaken as to its true locality"); *Gulf Oil Corp. v. Marathon Oil Co.,* 137 Tex. 59, 152 S.W.2d 711, 714 (1941) (agreement may be proven by acts and conduct falling short of express statement or acquiescence).

[¶ 14] In conjunction with Wilson's purchase of lot 3, he and Milligan orally agreed that Ober would survey the boundary. The trial court found that, although after the boundary was marked Wilson did not explicitly agree to it,[8] and that although he began to inquire into the boundary when he first saw the house, he had "requested and expected" that it would be marked by Ober. In short, Milligan and Wilson made a parol agreement that Ober would mark the boundary, and Steinherz is the beneficiary of that agreement. While Wilson's subsequent behavior does not demonstrate an uncontradicted agreement as to the location of the actual line marked, he must be held to the agreement itself and thus to its result. If a valid parol agreement is found, the agreement can determine an uncertain boundary. *See, e.g., Emery v. Fowler,* 38 Me. 99, 102 (1854) (boundary marked by mutual agreement of parties with intent to conform to a deed already given controls notwithstanding inconsistency with the deed).

[¶ 15] Although the conclusion of the trial court that the Ober survey established the boundary between lots 3 and 3A was arrived at by reason of a different legal theory, nevertheless the court's conclusion was correct, and its judgment must be affirmed. *See Baybutt Construction Corp. v. Commercial Union Ins.* 455 A.2d 914, 916 (Me.1983) (where trial court's ultimate conclusion is correct in law, it must be sustained on appeal, although its conclusion may have been reached on incorrect legal theory).

The entry is:

Judgment affirmed.

---

8. Wilson does not argue that Milligan had made an enforceable oral boundary agreement by virtue of telling him that the old foundation was on lot 3. In his summary of facts he merely states that prior to purchase he understood "[t]hat the lot included an area surrounding an old foundation."