76 P.3d 892

**Harry S. MEALEY, Jr., and Linda Mealey, husband and wife, Plaintiffs–Appellees,**

v.

**Jim Arndt and Anita ARNDT, husband and wife, Defendants–Appellants.**

**No. 1 CA–CV 02–0424.**

Court of Appeals of Arizona, Division 1, Department E.

Sept. 30, 2003.

Reconsideration Denied Dec. 9, 2003.

---

* The Honorable James E. Chavez, a judge of the Mohave County Superior Court, was authorized to participate as a Judge *Pro Tempore* of the Court of Appeals by order of the Chief Justice of the Arizona Supreme Court pursuant to article 6, section 31 of the Arizona Constitution and A.R.S. § 12–145 *et seq.* (1992 & Supp.2002).

Bonnett, Fairbourn, Friedman & Balint, P.C., By Tara L. Jackson, Phoenix, Attorneys for Plaintiffs–Appellees.

Gust Rosenfeld P.L.C., By Charles W. Wirken, Scott A. Malm, Phoenix, Attorneys for Defendants–Appellants.

## OPINION

THOMPSON, Judge.

¶ 1 This matter involves a boundary dispute between adjacent landowners. Appellants Jim and Anita Arndt appeal from a jury verdict awarding their neighbors, appellees Harry and Linda Mealey, a strip of property to which the Arndts hold record title. The Arndts contend that the evidence was insufficient to support the jury's verdict for the Mealeys on the theory of boundary by acquiescence. Because we conclude that there was insufficient evidence to support the finding that a definite, clear, visible boundary existed as required under the doctrine of boundary by acquiescence, we reverse and remand for further proceedings.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 We view the facts and all inferences in the light most favorable to sustaining the jury's verdict. *Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn,* 184 Ariz. 120, 123, 907 P.2d 506, 509 (App.1995). In 1971, J.B. Wilson hired Gordon McLain to survey and divide a parcel of real property in North Scottsdale into four sections. A thirty-foot-wide strip for a roadway ran along the western border of the property. McLain surveyed and divided the property into four sections of equal usable size, not including the roadway, and set survey pins at the corners. The parcels were designated parcels I, J, K, and L, with parcel J to the east of parcel I and both parcels I and J to the north of parcels K and L respectively. Parcels I and J, the subject of this appeal, were described on the survey as follows:

*Parcel "I"*

The N½ W½ SW 1/4 NE 1/4 SE 1/4 of Section 33, T5N R4E, G & SRB & M, Maricopa County, Arizona, Except the East 150 00 feet thereof.

*Parcel "J"*

The East 150 00 feet of the N½ W½ SW 1/4 NE 1/4 SE 1/4 Section 33, T5N, R4E, G & SRB & M, Maricopa County, Arizona.

¶ 3 In 1972, Nenver Rietveld purchased the four parcels. In 1978, he sold Parcel J to Charles and Mary Castelletti, appellant Anita Arndt's parents. Jim Arndt chose the lot for his father-in-law. In 1979, Nenver Rietveld sold Parcel I to Edward and Josephine Hernandez. Prior to selling the property, Rietveld located the survey pins where indicated by the original survey. The realtor who showed the property to the Hernandezes, Antje Coleman, pointed out the survey markers.

¶ 4 The deed for the property sold to the Hernandezes described their property, Parcel I, as follows:

The West half of the Northwest quarter of the Southwest quarter of the Northeast quarter of the Southeast quarter of Section thirty-three (33), Township five (5) North, Range four (4) East of the Gila and Salt River Base and Meridian.

The deed for the property sold to the Castellettis described their property, Parcel J, as follows:

> The East half of the Northwest quarter of the Southwest quarter of the Northeast quarter of the Southeast quarter of Section Thirty-three (33), Township Five (5) North, Range Four (4) East of the Gila and Salt River Base and Meridian.

The deeds split the combined property into east and west halves without referring to or accounting for the thirty-foot-wide strip along the western border of Parcel I.

¶ 5 Mr. Hernandez built a house on his property. For an unknown reason, the house was not built square on the property. Soon after, in 1979 or 1980, Mr. Hernandez built a barbecue pit and then sometime later a concrete patio around the pit. When constructing the patio, Hernandez strung a line from wooden stakes near the northeast and southeast survey markers to mark the eastern boundary of his property. The patio was poured within the line indicated by the string. The resulting patio, however, was not parallel to the 1971 survey line but, like the house, was built at an angle.

¶ 6 After helping the Castellettis purchase the property, Mr. Arndt visited the Castelletti property several times a year. In April 1990, the Castellettis conveyed Parcel J to the Arndts. In March 1991, the Mealeys purchased Parcel I from the Hernandezes. The Mealeys were told that the rear or eastern boundary of their property was eight to ten feet beyond the edge of the patio and that the property included the patio and barbecue pit. Mr. Mealey erected his portable horse pens on the property, aligning them with the patio in the belief that the patio was parallel to the property line. In September 1991, the Mealeys hired surveyors to determine the precise eastern boundary in preparation for installing a fence. The surveyors located the markers from the 1971 survey. For the first time, Mr. Mealey realized that the house and patio were not built square on the property and that the property line was not where he had believed it to be. Mr.

Mealey then noted that his horse pens were partly on the Arndts' property. Soon after this discovery, Mr. Mealey met the Arndts and told them about the encroachment. Mr. Arndt told him that he could leave the corral in place for the time being but that he would have to move it when the Arndts started to build.

¶ 7 In 1994, the Arndts hired Pinnacle Peak Engineering to conduct a formal survey of Parcel J in preparation for building a house. Using the legal description on the recorded deed, Pinnacle Peak determined that the patio, the horse pens, and a shed were encroaching on the Arndts' property. In February 1995, the Arndts sent a letter to the Mealeys advising them that they were encroaching on the Arndts' property and requesting that they remove the encroaching items. The Mealeys engaged Desert Foothills Surveys to survey their property based on the legal description in their deed. Like the Pinnacle Peak survey, the Desert Foothills survey concluded that the Mealeys' eastern boundary based on the legal description was approximately twenty feet west of the boundary indicated by the 1971 survey markers and that the boundary ran through their patio.

¶ 8 On December 14, 1995, the Mealeys filed an action to quiet title of the disputed strip of property based on adverse possession.[1] On December 22, 1995, the Arndts filed a quiet title and trespass action against the Mealeys. The cases were consolidated and went to trial in March 2001.

¶ 9 At trial, the Mealeys argued not only adverse possession but also boundary by acquiescence in support of their quiet title action. With regard to boundary by acquiescence, the trial court instructed the jury as follows:

> The Mealey Plaintiffs and the Arndt Defendants may have established the boundary line between their lands by acquiescence. Failure of the Arndt Defendants to object to an encroachment with the knowledge that the Mealey Plaintiffs have used

---

1. The Mealeys also sued the Hernandezes and the realtors who sold them the property on theories of negligent misrepresentation, negligence, and consumer fraud and the Hernandezes alone for breach of contract and mutual mistake. The real estate defendants settled before trial. The Hernandezes did not participate in the trial, and the court entered judgment as a matter of law against them.

and developed an area for ten years may amount to acquiescence establishing the boundary between their lands. The fact that one or both parties were mistaken as to the true boundary between their lands does not preclude the establishment of a boundary by acquiescence.

The jury returned a verdict in favor of the Mealeys on the theory of boundary by acquiescence, but the jury did not return a verdict on the theory of adverse possession. The jury awarded the Mealeys the entire twenty-foot strip from the northern to southern boundaries of the property.

¶ 10 The Arndts moved for judgment as a matter of law or, alternatively, for a new trial. They argued that the 1971 survey markers, on which the jury based its verdict, were insufficient to establish a boundary and that no evidence had been presented that the Arndts were aware of those markers, much less acquiesced to using them as a boundary. The Arndts also argued that boundary by acquiescence requires uncertainty as to the true boundary, that no uncertainty existed, and that evidence was insufficient to show use of the entire strip for the requisite period of time.

¶ 11 The trial court denied the Arndts' motion for judgment as a matter of law and the motion for new trial and entered judgment in favor of the Mealeys. The Arndts timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes (A.R.S.) sections 12–120.21(A)(1) (1992) and 12–2101(B) (1994).

## DISCUSSION

■■■ ¶ 12 The Arndts argue that the Mealeys presented insufficient evidence to support the finding that the parties acquiesced to a recognizable boundary. In reviewing a jury's verdict, we view the evidence and the inferences in the light most favorable to upholding the judgment. *Hyatt Regency*

*Phoenix Hotel Co.*, 184 Ariz. at 123, 907 P.2d at 509. We affirm the judgment if substantial evidence was presented to permit reasonable persons to reach the decision reached by the jury. *Hutcherson v. City of Phoenix*, 192 Ariz. 51, 53, ¶ 14, 961 P.2d 449, 451 (1998). "Substantial evidence" is " 'any relevant evidence from which a reasonable mind might draw a conclusion.' " *Troutman v. Valley Nat'l Bank of Arizona*, 170 Ariz. 513, 518, 826 P.2d 810, 815 (App.1992) (quoting *Matter of Estate of Mustonen*, 130 Ariz. 283, 285, 635 P.2d 876, 878 (App.1981)). We must set aside a verdict, however, if there is not substantial evidence in the record to justify it. *Styles v. Ceranski*, 185 Ariz. 448, 450, 916 P.2d 1164, 1166 (App.1996) (citing *Spain v. Griffith*, 42 Ariz. 304, 305, 25 P.2d 551, 551 (1933)).

■■ ¶ 13 Although Arizona has acknowledged the doctrine of boundary by acquiescence, it has not clearly defined the elements. *Hein v. Nutt*, 66 Ariz. 107, 114, 184 P.2d 656, 661 (1947). We therefore look to other jurisdictions. Generally, to establish the doctrine of boundary by acquiescence, the party asserting the doctrine must prove (1) occupation or possession of property up to a clearly defined line, (2) mutual acquiescence by the adjoining landowners in that line as the dividing line between their properties, and (3) continued acquiescence for a long period of time. *Davis v. Mitchell*, 628 A.2d 657, 660 (Me.1993); *Platt v. Martinez*, 90 N.M. 323, 563 P.2d 586, 587 (1977); *Knox v. Bogan*, 322 S.C. 64, 472 S.E.2d 43, 49 (Ct.App.1996); *Staker v. Ainsworth*, 785 P.2d 417, 420 (Utah 1990); Kurtis A. Kemper, *Cause of Action to Establish Boundary by Acquiescence of Adjoining Landowners*, 3 COA 2d 729, 743 § 5 (1993). In Arizona, the required period of time for acquiescence is ten years, the same as that for adverse possession. A.R.S. § 12–526(A) (2003); *Hein*, 66 Ariz. at 114, 184 P.2d at 661.[2]

---

2. Whether a party must prove a dispute or uncertainty over the true boundary differs by jurisdiction. *See Rabjohn v. Ashcraft*, 252 Ark. 565, 480 S.W.2d 138, 141 (1972) (uncertainty not required); *Hutchins v. Strickland*, 674 So.2d 870, 873 (Fla.Dist.Ct.App.1996) (uncertainty required); *Sproles v. McDonald*, 70 N.M. 168, 372 P.2d 122, 125–26 (1962) (uncertainty not required); *Knox*, 472 S.E.2d at 49 (uncertainty not required); *Doria v. Suchowolski*, 531 S.W.2d 360, 364 (Tex.Civ.App.1975) (uncertainty required); *Staker*, 785 P.2d at 424 (objective uncertainty not required). One commentator has noted that, where a plaintiff need not prove uncertainty, uncertainty is presumed, but the defendant can always defeat the claim of boundary by acquiescence by affirmatively proving that the location of the true boundary was known. Kemper, 3 COA 2d at 766–67 § 14. In addition, some jurisdictions require such proof by clear

¶ 14 The Mealeys argued at trial that the 1971 survey pins constituted a boundary for the purpose of the boundary by acquiescence claim. The Arndts argue that the survey markers did not establish a sufficiently definite or visible boundary line. They also argue that the Mealeys did not present sufficient evidence that the Arndts knew about the survey pins or that they acquiesced to the boundary the pins purported to represent.

■■ ¶ 15 To support a finding of boundary by acquiescence, the boundary in question must be definite, visible, and clearly marked. *Calthorpe,* 441 A.2d 284, 289 (Me. 1982) (line must be "visible line marked clearly by monuments, fences or the like"); *Manz v. Bohara,* 367 N.W.2d 743, 746 (N.D. 1985) (line must be "definite, certain, and not speculative, and open to observation"); *Platt,* 563 P.2d at 587 (line must be "clear and certain . . . (such as a fence)") (quoting *Sachs v. Bd. of Trs. of the Town of Cebolleta Land Grant,* 89 N.M. 712, 557 P.2d 209, 214 (1976)); *Monroe v. Harper,* 619 P.2d 323, 324–25 (Utah 1980) (line must be a "visible line marked by monuments, fences, or buildings"); *Lamm v. McTighe,* 72 Wash.2d 587, 434 P.2d 565, 569 (1967) (line must be "certain, well defined, and in some fashion physically designated upon the ground, e.g., by monuments, roadways, fence lines, etc."); Kemper, 3 COA at 748–49 § 8 and 768 § 15. A party cannot be said to acquiesce in a boundary unless the boundary can be identified with certainty. *Calthorpe,* 441 A.2d at 290.

¶ 16 In a Utah case, a purchaser bought property from a seller who owned adjoining parcels, and the purchaser stretched string between markers to establish the boundary, planted a small orchard inside the line to serve as a boundary line, installed hose bibs to service the orchard, and installed a gravel roadway. *Monroe,* 619 P.2d at 324. Twenty-six years later, the seller's successors in interest surveyed the property and found a seventeen-foot discrepancy in the location of the property line. *Id.* The Utah Supreme Court found that the orchard and gravel driveway did not meet the requirement that the property be occupied "up to a visible line marked definitely by monuments, fences, or buildings." *Id.* at 324–25. The court noted that, although the trees and the driveway were within the disputed strip, neither actually marked the boundary. *Id.* at 325. Therefore, there was no visible boundary line to support the doctrine of boundary by acquiescence. *Id.*

¶ 17 In another case, the North Dakota Supreme Court found that a boundary marked by three rock piles with a trail between them, recognized by all parties as a boundary line between the properties for more than fifty years, did not constitute a boundary by acquiescence. *Manz,* 367 N.W.2d at 748. According to the court, one rock pile had been removed, and the trail, which no longer existed, could move from one location to another depending on the use of the land. *Id.* The court concluded that the line did not have the visibility, certainty, and persistency of placement necessary for a boundary by acquiescence. *Id.*

■ ¶ 18 In this case, the area at issue is partially developed Scottsdale desert with a lot of brush on the property. The asserted boundary consists of two survey pins implanted in 1971 approximately 300 feet apart. The Mealeys did not know about the pins until surveyors they hired to determine the property line discovered the markers while walking on the property. Mr. Arndt testified that he first saw the survey pins in 1999, after the commencement of the lawsuit, and described them as being "down in the dirt." Photographs of the marker at the southeast corner of the Mealeys' property show a circular red and rust colored tube several inches in diameter protruding two to four inches above the ground. The Mealeys presented no evidence of any other visible markers or structures between the survey pins to define the boundary. Even viewed in the light most favorable to the Mealeys, this evidence does not support a conclusion that a visible, definite, and certain boundary sufficient to transfer legal ownership of property under the

and convincing evidence. *Calthorpe v. Abrahamson,* 441 A.2d 284, 289 (Me.1982); *Manz v. Bohara,* 367 N.W.2d 743, 748 (N.D.1985); *City of*

*Deadwood v. Summit, Inc.,* 607 N.W.2d 22, 27 (S.D.2000).

doctrine of boundary by acquiescence existed at the location asserted by the Mealeys.

¶ 19 That the asserted boundary was not clearly and definitively marked was evidenced by the actions of Mr. Hernandez and Mr. Mealey. Mr. Hernandez, in building his patio, strung string from between the two points he believed marked his boundary so that the patio would be parallel to the property line. Although the patio was poured parallel to the string and the house, the patio was actually built at an angle to the property line. In 1991, Mr. Mealey similarly mispositioned his horse corral. Because the description he was given of the property line was so vague, he constructed the corral parallel to the patio and later learned he had built the corral at an angle on the Arndts' property.

¶ 20 In at least one case, survey pins have been found sufficient to establish a boundary by acquiescence. In *Harris v. Robertson*, the Strattons sold three acres of an eleven-acre tract, keeping the remaining eight acres. 306 Ark. 258, 813 S.W.2d 252, 252 (1991). Before the sale, Mr. Stratton and Mr. Robertson walked the land, agreed on the boundaries, and fixed the corners with iron pins. *Id.* The Strattons then hired a surveyor to determine the legal description of the property, but the resulting legal description did not correctly describe the property marked. *Id.* Eleven years later, the Strattons' successors in interest constructed a fence along the boundary, the location of which concerned the Robertsons. *Id.* at 253. The Robertsons then had a survey conducted and discovered the error in the deed descriptions. *Id.* The Arkansas Supreme Court held that the pins were sufficient in that case. *Id.* at 254. The court noted that testimony showed that Mr. Robertson and Mr. Stratton had together decided on the location of the pins prior to the original survey, that the parties knew where the pins were and knew that the pins defined the boundary, that the parties had never occupied any of the property across the boundary established by the pins, and that on the parts of the property that were mowed, each mowed up to the line established by the pins. *Id.* at 254–56.

¶ 21 In the current case, the parties were not involved in the original determination of the boundary. In addition, the Mealeys' corral occupied part of the property across the boundary they claim was established by the 1971 survey pins. Further, Mr. Mealey's own testimony demonstrated that he did not know where his property boundary was and that he did not know about the pins until they were discovered for him.

¶ 22 The Mealeys argue that they presented substantial evidence that the Arndts were aware of the pins. They presented evidence that Rietveld located the pins before selling the lots, that one pin was located near an electrical box, and that the pins were in the same location as indicated on the 1971 survey. The Mealeys also presented testimony from Hernandez and Jack Milliman, who purchased and still owned the property south of the Mealeys', that Coleman, the realtor who had showed them the property, had showed them the markers and the electrical box and had told them that they marked the boundary for the property.

¶ 23 The Mealeys argue that the Arndts offered no evidence at trial to refute the conclusion that Coleman was the same realtor who showed the property to them and to the Castellettis or to refute that she showed them the markers as she had the others. They contend that Mr. Arndt's testimony that he was unaware of the pins was unbelievable and that he was not a credible witness because he was impeached with numerous prior inconsistent statements. However, the Mealeys, and not the Arndts, had the burden of proof. *Calthorpe*, 441 A.2d at 289. The Mealeys have directed us to nothing in the record, and we have not found anything in the record, indicating that Coleman was involved in the Castellettis' purchase of the property or that the Arndts and Castellettis were informed of the pins and their significance from any other source.[3]

¶ 24 The Mealeys did not present sufficient evidence of a clear, certain, identifiable boundary as required by the doctrine of

---

3.  The record shows that Coleman served as notary public for the signatures of both Rietveld and the Hernandezes on the deed conveying the parcel to the Hernandezes, but she did not serve as notary for Rietveld's signature on the Castellettis' deed. The Castellettis' signatures were notarized by a notary public in New York, where they lived.

boundary by acquiescence. We do not address the Arndts' additional argument that the Mealeys presented insufficient evidence that the Mealeys used the disputed property up to the boundary line.

## CONCLUSION

¶ 25 Because we conclude that insufficient evidence was presented of a clear, certain, visible boundary to which the parties acquiesced, we reverse the judgment for the Mealeys based on the doctrine of boundary by acquiescence. We remand for further proceedings.

¶ 26 The Arndts request their attorneys' fees incurred in the trial court and on appeal. We decline to award attorneys' fees at this time.

CONCURRING: G. MURRAY SNOW, Presiding Judge, and JOHN C. GEMMILL, Judge.