GEORGE W. MCLELLAN, et als. *vs.* JOHN E. MCFADDEN, et als.

Washington.   Opinion December 14, 1915.

*Abandonment.    Boundaries.    Mortgage.    Municipal Permit.*
*Prescription.    Title.    Weir.*

1. A legislative grant in 1870 of the right to construct and maintain fish weirs in tide waters at a certain place was not abrogated by Chapter 78 of the Laws of 1876 which required persons intending to build a fish weir to apply to the municipal officers for a license, and authorized the municipal officers to grant the same.

2. One holding a legislative grant of the right to construct and maintain a fish weir at a certain place is not required to obtain municipal license therefor under section 96, Chapter 4 of the Revised Statutes.

3. When land on or by tide water conveyed by deed is described as bounded "on the east by the shore," and nothing else indicative of intention appears in the deed, the shore itself is the monument, and the land between high and low water mark does not pass by the grant.

4. A fish weir in tide waters did not pass as appurtenant to a farm in front of which it stood, when by the description in the deed of conveyance the land granted was bounded on the seaward side by the inner line of the shore.

5. The burden is on him who sets up the abandonment of a legal right or privilege and he must prove it by clear evidence of unequivocal acts.

6. A prescriptive right to the enjoyment of a fish weir in tide waters, constructed under a special legislative grant, may be acquired against the grantee by open, notorious, uninterrupted, exclusive and adverse use for a period of twenty years by the occupier and those under whom he claims.

On report.  Judgment for defendants.

This is an action on the case to recover damages of defendant for constructing and maintaining a fish weir on a weir privilege claimed by plaintiffs, in the tide water of Herring Cove in the town of Trescott, Washington county.  Plea, the general issue with brief statement.

The case is stated in the opinion.

*H. E. Saunders, and H. H. Gray,* for plaintiffs.

*C. B. & E. C. Donworth,* for defendants.

SITTING: SAVAGE, C. J., SPEAR, KING, BIRD, HALEY, HANSON, JJ.

. SAVAGE, C. J.   This case is concerned with the ownership of a fish weir and fishing privileges in Herring Cove in the town of Trescott.   The case comes up on report.   The plaintiffs claim to own them as heirs of George W. McLellan, deceased.   The defendants claim to own them by grant from George W. McLellan's mortgagee; also, by a prescriptive title.   The suit is brought to recover damages for an interference with, and a disturbance of, the plaintiffs' rights.

Herring Cove lies in front, and to the eastward, of Herring Cove lot, so called.   The following sketch shows the situation.

The lot formerly belonged to the William Bingham estate.   It was conveyed in 1863 to Elizabeth McFadden.   In the description it was bounded on the east, or seaward, side, "by the shore."   In 1864, Mrs. McFadden conveyed it by the same description to George W. McLellan and two others.   In 1865 and 1866 these others conveyed their interests to George W. McLellan, each using the same description, but adding, "this deed is intended to convey all my right, title to and in the boats, seines and all connected in carrying on the herring fishing at the Cove, sold to the said George W. McLellan."

In 1870, George W. McLellan was granted by the Legislature the right "to construct and maintain wharves and fish weirs in front of his land in the tide waters of Herring Cove, in the town of Trescott, within the limits of an extension of the side lines of his land, east-

erly, one hundred rods from low water mark, in the waters of said cove; provided that no obstruction shall be made to the usual navigation of the waters of said cove, and that suitable signals shall be erected on said weirs, to be not less than ten feet above the tide at high water." Private and Special Laws, 1870, Chap. 326. The general law at that time provided that "no weir . . . shall extend into more than two feet depth of water, at ordinary low water." Laws of 1869, Ch. 70, Sect. 13.

In 1878, George W. McLellan mortgaged the Herring Cove lot to his brother, Wilson. The description in the mortgage bounded the lot "on the east by the shore," and called it the "Herring Cove Farm." No mention was made of weirs or fishing privileges. George W. McLellan died in 1889, and the mortgage was foreclosed later by Wilson McLellan, the foreclosure becoming absolute in March, 1894.

In June, 1896, Wilson McLellan conveyed to John E. McFadden and another an undivided quarter interest in the "Herring Cove Farm" lot, bounding it "on the east by the shore;" "also one undivided quarter of weir being on the shore of said farm." Subsequently by mesne conveyances all the title to Herring Cove Farm came to the defendants. In all these conveyances the lot was bounded "on the east by the shore," and in all, undivided interests in the fish weir were conveyed.

As early as 1866, George W. McLellan operated a weir in Herring Cove. And after he received the legislative grant in 1870, he continued to maintain and operate a weir there until the time of his death in 1889, but somewhat intermittently from 1881 to 1887. In 1887, the weir was rebuilt. In the latter part of his life McLellan removed to Massachusetts, but came back summers to operate the weir. And he died while at the weir. After the death of George W. McLellan, and until Wilson McLellan sold the property in 1896, the latter leased the weir from year to year to Stewart McFadden and his brothers. Since 1896, the defendants, and those under whom they claim, have operated the weir annually. The weir has been rebuilt by them more or less each year, some years most of it going out by stress of the elements. The present weir is located in the same place as the original McLellan weir was but inside its lines. The operators of the weir have piled their weir material on the beach, have used the shore as a landing place with boats and brush

racks, and for the general purposes incidental to the operation of the weir. They have gathered drift wood on the beach for smoking purposes, and in some instances have permitted other persons to take away sea weed. Such possession as they had was not interrupted. This is the substance of the evidence relating to use, possession and control of the weir and the shore.

The plaintiffs claim an exclusive right to the fishing privilege under the legislative grant to their father and his heirs in 1870. The defendants answer in denial of plaintiffs' right, 1, that this grant was abrogated by Laws of 1876, Chapter 78, so that the right did not descend to the plaintiffs; 2, that the plaintiffs have not been granted municipal license under the general law, R. S., Ch. 4, Sect. 96, to build and maintain the weir; 3, that the plaintiffs have abandoned all rights and privileges under the grant; and in support of their own right, 4, that they have title under the mortgage of George W. McLellan to Wilson McLellan to the farm and shore, and that the legislative grant, if not abrogated, passed under the mortgage as appurtenant to the shore, the thing granted; and if they have no title by grant, 5, that they have acquired a prescriptive right by open, notorious, continuous, exclusive and adverse use, occupation and control of the shore and weir, for a period of more than twenty years. The plaintiffs in reply say that, claiming under a special legislative grant, they are not required to obtain a municipal permit; they deny abandonment and the defendant's prescriptive title; they say that the mortgage under which defendants claim conveyed only to the shore, and not the shore itself, that the weir was not appurtenant to the upland granted, and that if the shore was granted the weir was not, from its nature, appurtenant to the shore.

We will first inquire as to the plaintiffs' rights under the legislative grant. No question is made, or can be made, but that George W. McLellan, and, unless the grant was abrogated, his heirs or assigns after him, obtained a right to build and maintain a fish weir in Herring Cove. We think the grant was not abrogated or annulled by the general law of 1876, chapter 78, which required persons intending to build a fish weir to apply to the municipal officers for a license, and authorizing the municipal officers to grant the same. This question is res adjudicata in this State. In *State* v. *Cleland*, 68 Maine, 258, the court held that the general-law did not defeat a

special legislative license, like the one in this case, although the licensee had not built his weir when the general statute was passed; and that the licensee was not required to obtain a municipal license. The Cleland case, though the opinion was by a divided court, has stood unquestioned for nearly forty years, and must be regarded as a correct exposition of the law. The facts in this case are even stronger for the plaintiff than those in the Cleland case. For here, the licensee had built his weir several years before the general law was passed. And the general law in terms applied only to future erections. It follows, then, that George W. McLellan, when he mortgaged the lot in 1878, owned the weir, and had the right of fishery in the cove, and that his right in the weir and fishery descended to and is held by his heirs, unless defeated by the mortgage, or in some other way.

The next question is, Did his mortgage include the fishing rights? And connected with that is the question, Did it include the shore? The word "shore," in conveyances of land by tidal waters, is construed to mean the land between high water mark and low water mark. *Montgomery* v. *Reed,* 69 Maine, 510. By the Colonial Ordinance of 1641-7 it was declared that "in all creeks, coves and other places, about and upon salt water, where the sea ebbs and flows, the proprietor of the land adjoining shall have propriety to the low water mark, when the sea doth not ebb above one hundred rods, and not more wheresoever it ebbs further." By force of this ordinance it is held that the owner of upland adjoining tide water prima facie owns to low water mark, not exceeding one hundred rods; and does so, in fact, unless the presumption is rebutted by proof to the contrary. *Proctor* v. *Railroad Co.,* 96 Maine, 458. A grantor may separate the flats from the upland. But unless the flats are excluded by the terms of the grant, properly construed, they pass by a grant of the upland. *Whitmore* v. *Brown,* 100 Maine, 410.

So we must look to the terms of the grant. In construing the grant we are to give effect, if possible, to the intention of the parties, so far as it can be ascertained in accordance with legal canons of interpretation. We are to give effect to the expressed, rather than the surmised, intent. We are to consider all the words of the grant in the light of the circumstances and conditions attending the transaction. But we must consider and construe the grant accord-

ing to settled rules of construction. They are rules of property. And the security of real estate titles depends upon a strict adherence to these rules of construction.

In the mortgage of 1878, the land was bounded and limited by specified monuments. It was bounded on the north by land of Charles Balch, on the south by land of one Wellington, and on the west by land of one Chalorner. These were the limits. On the east, (the side towards Herring Cove) it was bounded "by the shore." The shore itself was made the boundary, and the shore is the whole area of land between high water mark and low water mark. "By the shore," in such case, is ordinarily a phrase of exclusion. The shore is the monument limiting the grant. It is not a part of the grant. It is as much outside the terms of the grant as are the lands of owners on the other three sides.

But what was intended by the use of the word shore may be gathered not only from the word itself, but from other expressions in the deed, read in the light of existing conditions. For instance, in *Doane* v. *Willcutt,* 5 Gray 328, the land was bounded on one side "by the sea or beach," and the word "sea" was held to afford sufficient indication that the intention was to convey to the sea, or seaward side of the beach. Perhaps the greater number of controversies have arisen where, instead of making the shore itself the boundary, ex vi termini, the boundary line has been made to begin at a fixed point, and thence to run by courses or monuments,—and thence "by the shore." In such cases, the courts have been asked to determine which side of the shore the line was intended to follow. Such a case was *Dunton* v. *Parker,* 97 Maine, 461, in which the court said,—"It does not follow from the mere fact that the shore of land is made a boundary, or that boundary is 'by the shore,' that it is by high water mark. The space between high and low water mark, properly called the shore, is frequently of many rods in width, it has an outer or seaward side, and an inner or upland side, and, nothing else appearing, a boundary by the shore may be as well intended to mean the one as the other. To determine which side of the shore was intended as the boundary it is necessary to go further." In *Doane* v. *Willcutt,* supra, the court said:—"In a conveyance, when a *line of 'shore'* is used as an abuttal, unexplained by circumstances, it may be ambiguous, leaving it doubtful whether the sea

side or the land side of the shore is intended.    In general it will appear by the context which." So, in *Dunton* v. *Parker,* this court resolved the ambiguity by reference to the context.    The other calls in the deed, and the termini of the call in question made it quite certain that the line was intended to run by the seaward side of the shore, or by low water mark.    So in *Snow* v. *Mt. Desert Island R. E. Co.,* 84 Maine, 14, the description began "at the sea," continued by several calls "to the shore," thence "to the first bounds mentioned," which was *at the sea,* and the court held that the line followed the seaward side rather than the land side of the shore. See *Dillingham* v. *Roberts,* 75 Maine, 469.    In the mortgage deed before us the context affords no light whatever.    The boundary is simply "by the shore."

Sometimes the views of courts based upon a consideration of all parts of a deed have been strengthened by the consideration that no motive or reason appeared for a separation.    In *Snow* v. *Mt. Desert Island R. E. Co.,* supra, the court said:—"Nothing appears showing the beach at that date to be of any value apart from the upland, of any value to reserve in granting the upland, either by reason of wharves or weirs thereon, or by any other reason of any other opportunity for separate occupation or quasi-cultivation."    But it is evident that these reasons do not hold in this case.    The shore as a means to the convenient and successful operation of the weir privilege was of value, separated from the farm.    If, as the defendants claim, the fishing privilege was appurtenant to the shore, a mortgage of the shore would have carried the privilege.    The owner might well have wished to separate the two, and retain his valuable fishing privilege, unencumbered by mortgage.

We have been cited to no case, and we know of none, that holds that, where the shore itself is made the monument, as where the land granted is bounded "by the shore," and nothing else appears, the inner side of the shore or high water mark is not the boundary line; or that the shore itself is not excluded.    In the case of *Niles* v. *Patch,* 13 Gray 254, the call was "bounded westerly by the beach." Chief Justice Shaw who had written the opinion in *Doane* v. *Willcutt,* supra, speaking for the court, said:—"We would not say that there might not be such terms in the deed, as, connected with the term 'beach' would indicate an intention to include the beach; and such intent, if any, manifest in the deed, would govern its con

struction and convey the beach. But in this deed there is no such qualification, and therefore the court are of opinion that the defendant did not acquire by it a title in fee to the beach." The foregoing reasoning applies also to the deed of the Bingham estate to Elizabeth McFadden, George W. McLellan's grantor. The description in that deed was the same as in the later mortgage to Wilson McLellan, and by the same reasoning excluded the shore. So that, when he mortgaged, George W. McLellan did not own the shore.

We therefore conclude in this case that the mortgage of 1878 to Wilson McLellan did not include the shore. The shore being excluded by the descriptive terms in the mortgage, it did not pass even as appurtenant to the land granted. *Warren* v. *Blake,* 54 Maine, 276; *Whitmore* v. *Brown,* 100 Maine, 410. To say nothing of the fact that the fishing privilege was separated from the farm granted by the shore, which is nearly five hundred feet wide at the head of the cove, there is no such connection in use between the fishing privilege and the farm as would make the former appurtenant to the latter. The fishery was not in any way necessary to the enjoyment of the farm. *Leonard* v. *White,* 7 Mass., 6. It follows that the weir and the fishery right under the legislative grant descended to plaintiffs as heirs of their father, unencumbered by the mortgage. Have they been lost since, either by abandonment or by prescription?

The plaintiffs live in Massachusetts. And prior to 1913, they had not been in Trescott for 38 years, except in 1889, when one came to get the body of their father. After their father's death, they neither operated, nor attempted to operate the weir. One of them testifies that in 1894 he had an intention to operate it that year, but was prevented by circumstances. Another witness, his son, testifies that he made arrangements in 1908 to come down and fish the weir, under his father and the other heirs, but was prevented, likewise, by circumstances. There is no other evidence of an intention to operate. It appears that they did not know even the terms of the grant.

But the burden is on him who sets up abandonment to prove it. And the proof must be clear and unequivocal of acts decisive and conclusive. *Adams* v. *Hodgkins,* 109 Maine, 361. Abandonment is a voluntary, intentional act. There is no abandonment unless so intended. But the intention may be inferred from circumstances. It

may be inferred by lapse of time or non-use, accompanied by other circumstances. 1 Ruling Case Law 5. And among the circumstances is the fact that the right in question is being adversely used by others. *Great Falls Co.* v. *Worster,* 15 N. H., 412. But mere lapse of time, or mere non-use is not sufficient evidence of abandonment. *Adams* v. *Hodgkins,* supra; *Smith* v. *Booth Bros. & H. I. Granite Co.,* 112 Maine, 297. Although in this case the lapse of time and non-use for so long a time, 24 years, considered in connection with their apparent ignorance of the terms of the grant and the continued adverse use of the privilege for all the time by others, afford considerable evidence of an intention to abandon, we prefer to put our decision upon another ground.

Wilson McLellan took possession and control of this weir and privilege in July, 1889, though his mortgage, as we have seen, did not cover them. From that time until he sold the farm and the weir to the defendants and those under whom they claim, in 1896 and 1897, he operated the weir by lessees. Since then it has been operated each year by them or their grantors. We think there can be no question but that the occupation has been adverse, and under a claim of title. Neither Wilson McLellan while he occupied, nor any grantee since, has interrupted the continuance of the adverse character of the occupation by any admission of the plaintiff's title. It is true that some of the defendants in 1893 made overtures to the plaintiffs with a view to purchase the weir and privilege. But at that time they were mere lessees of the weir under Wilson McLellan. Other than that they had no possessory title or right. And their acts at that time could not affect Wilson McLellan's possessory rights, nor prevent them from afterward occupying adversely in continuance of those rights. So that there has been an uninterrupted adverse use and occupation for more than twenty years. *Cole* v. *Bradbury,* 86 Maine, 380. The occupation has been open, exclusive and continuous. Though the weir was not operated at all seasons of the year, it was operated every year at the proper season, and that constituted continuity, within the meaning of the word, as an element in prescriptive titles.

In conclusion we say that all the elements of prescriptive right appear in the defendants. The plaintiffs have lost their right. And the certificate must be,

*Judgment for defendants.*