MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2024 ME 65
Docket:        BCD-22-403
Argued         September 12, 2023
Decided:       August 20, 2024
Revised:       October 24, 2024

Panel:         STANFILL, C.J., and MEAD, CONNORS, LAWRENCE, and DOUGLAS, JJ.*


JOHN M. CARTER et al.

v.

MICHAEL A. VONCANNON et al.


LAWRENCE, J.

[¶1]  John M. Carter and Christine C. Carter (the Carters) appeal from a judgment entered by the Business and Consumer Docket (*Murphy, J.*) after a bench trial on a variety of claims and counterclaims concerning the use and ownership of certain property in the Holiday Beach neighborhood in Owls Head.  Michael A. Voncannon and N. Kermit Voncannon (the Voncannons) and Zachary Rogers and Kathryn Rogers as Trustees of the Nancy C. Rogers Irrevocable Trust (the Rogerses) cross-appeal from the same judgment regarding the court's determination that the Carters have superior title to

---

* Although Justice Jabar participated in this appeal, he retired before this opinion was certified.

2

Austin Avenue, a "paper street" appearing on plans depicting the Holiday Beach

neighborhood.  We affirm the judgment.

## I.  BACKGROUND

[¶2]  This case involves a dispute over the ownership and boundaries of

two proposed, unaccepted ways—known as "paper streets"[1]—that transect

several lots of land in the Holiday Beach neighborhood of Owls Head.  The lots

are owned by the Carters, the Voncannons, and the Rogerses.[2]

[¶3]  The first of the two paper streets, Austin Avenue, runs roughly north

to south and lies between the eastern boundary of the Carter lot and the

western boundaries of the Voncannon lot and the Rogers lot.  The Voncannon

lot and the Rogers lot abut opposite sides of the second paper street, referred

to as "the Reserved Way," which runs east to west.  The Voncannon lot and the

Rogers lot are bounded to the east by Holiday Beach Road.  Provided here for

illustrative purposes only, *Figure 1* depicts the locations of the lots and the

paper streets.

---

[1]  A paper street is "a thoroughfare that appears on plats, subdivision maps, and other publicly filed documents, but that has not been completed or opened for public use."  *Street*, Black's Law Dictionary (12th ed. 2024).

[2]  George Graner, Mary Graner, Steven A. Comiskey, and Nancy L. Comiskey, other lot owners in the Holiday Beach neighborhood, were originally parties in this case; they reached a settlement with the Carters on February 22, 2022.  The Graner lot is located immediately south of the Voncannon lot, and the Comiskey lot is located immediately north of the Rogers lot.  The Graner lot and Comiskey lot are located east of the Carter lot, and they are separated from the Carter lot by one of the paper streets at issue in this case, Austin Avenue.  *See infra Figure 1*.



*Figure 1*

[¶4]  In its November 12, 2022, judgment, the court found the following facts, which are supported by competent record evidence.  *See Fissmer v. Smith*, 2019 ME 130, ¶ 40, 214 A.3d 1054.

## A.    Chain of Title

[¶5]  The Holiday Beach neighborhood was created out of a forty-acre tract that was originally acquired by Daniel Pierce via a deed (the Pierce deed) from Sarah Perry on June 23, 1866.  The Pierce tract was bounded to the east by the high-water mark of Owls Head Harbor, and to the north by the line separating the neighborhood from land formerly owned by Harrison Emery,

4

known as the Emery line.[3]  In the 1880s, Pierce subdivided his property and

sold many of the resulting lots.

[¶6]  Pierce first conveyed a lot by deed to J.H. Flint (the Flint deed) on

July 3, 1884.  Other lots in the area were later located using references to the

Flint lot.  The Flint lot is now part of the Voncannon lot.  The Flint deed

described the northeast corner of what is now the Voncannon lot as located

> [a]t a stake and stones in an angle formed by the junction of two reserved roads[,] one running on the westerly shore of Owls Head [H]arbor, the other running westerly from said shore road parallel with the Harrison Emery line, the point of junction being three hundred and sixty[-]six feet from the Emery line and two rods from the edge of the bank; thence North 77 degrees West, or parallel with the Emery line on the south side of the second named reserved street one hundred and three feet . . . .

The road "running on the westerly shore" is now Holiday Beach Road, and the

reserved road "running westerly from said shore road" is the Reserved Way.

[¶7]  Pierce later conveyed parcels by deed to Benjamin Williams on

August 22, 1884 (the 1884 Williams deed), and April 13, 1885 (the 1885

Williams deed).  The 1884 Williams deed describes the southern boundary of

the Williams lot, which is now part of the Rogers lot, as running "[e]asterly by

---

[3] The Pierce deed describes the Emery line as "[b]eginning at stake and stones at high water mark on the west side of Owls Head Harbor; thence North 76 1/2 degrees West 91 rods to the center of the town road."  At some point, a stone wall was built in the approximate location of the Emery line, but that wall is now bowed and crooked in multiple locations.  Although the Pierce deed provides a single bearing and length for the Emery line, it does not make any reference to any physical marker beyond a "stake" and "stones."

said reserved street [running parallel to the said Emery line] one hundred feet to first bound," with the first bound being "three hundred and thirty-three feet from the Emery line at the junction of two reserved streets." The reserved street described as running parallel to the Emery line is the Reserved Way, meaning the southern boundary of the Williams lot was the northern edge of the Reserved Way, located thirty-three feet, or two rods, north of what is now the Voncannon lot. Neither Pierce nor his successors in title ever conveyed Austin Avenue or the Reserved Way.

[¶8] The Carters purchased their lot in 2010. The language in their deed describing the lot originated in a deed dated October 29, 1969, by which Sam Pipicello conveyed parcels to Nelson R. and Dolores K. Ells (the Ells deed).[4] In relevant part, the Ells deed conveyed

> Lot[s] #4, #5, and the southwesterly portion of Lot #6 as delineated on plan of O.H. Tripp, C.E., entitled "Plan of Cottage Lots at [Holiday] Beach, South Thomaston, Maine, for sale by F.M. Smith." [the Tripp plan]
>
> . . . .
>
> ALSO, all my right, title and interest in and to that portion of Austin Avenue, said reserve for a way not being opened and used, fronting and lying southeasterly of the parcel of land hereinabove conveyed.

---

[4] Sam Pipicello's predecessor-in-title acquired the remainder of Pierce's land that had not yet been deeded out in 1918, including title extending to the high-water mark along Holiday Beach Road, part of which the Carters now claim was included in their conveyance.

6

> ALSO, all my right, title and interest in and to a reserve for a way delineated on the aforesaid O.H. Tripp plan[,] which extends from Austin Avenue, at a point opposite the line dividing Lot #4 and Lot #5 aforesaid, to [Holiday Beach Road] and the shore, said reserve not being opened and used.

The Tripp plan referenced by the Ells deed is a generalized schematic drawing of much of the Holiday Beach neighborhood and is reproduced in relevant part in *Figure 2*.[5]



*Figure 2*

## B.  Usage of the Reserved Way

[¶9]  Since 1980, the Voncannons and their predecessors-in-title have used the half of the Reserved Way abutting their property as a driveway and

---

[5] The Tripp plan does not contain any measurements, angles, or bearings.  It depicts the Reserved Way as extending east from Austin Avenue toward the shore, and while its eastern terminus is not clearly marked, the parallel lines representing the paper street end just above the words "Ocean Drive," which is the area where Holiday Beach Road is currently located.  The Tripp plan does not show where the Reserved Way reaches the waters at Owls Head Harbor, nor does it show the Reserved Way as definitively terminating there.

the only entrance to their property. Similarly, since 1934, the Rogerses and their predecessors-in-title have used the half of the Reserved Way abutting their property as a driveway and the only entrance to their property. The gravel driveways abut each other at the Reserved Way's intersection with Holiday Beach Road and then diverge to provide access to the Voncannons' and Rogerses' respective garages. Since purchasing their lots, the Voncannons and the Rogerses have always parked their cars on, and maintained the gravel surface on, their respective driveways.[6] Since they purchased their lot in 2008, the Voncannons have also kept a backup generator on land adjacent to their house that is designated as the Reserved Way.

[¶10] Since at least the 1960s, the Voncannons, the Rogerses, and their predecessors have used the western portion and nongraveled eastern portion of the land designated as the Reserved Way as part of their yards, including by planting trees, pruning tree limbs, installing and mowing lawns, landscaping, planting and maintaining flower and vegetable gardens, composting, and using the area for picnics and storage. On plans of the area dating back to the late nineteenth century, the Voncannon house appears to slightly encroach on the

---

[6] On occasion, the Voncannons and the Rogerses, and their predecessors-in-title, gave each other permission to park vehicles in the other neighbor's driveway (for example, to accommodate multiple visitors or to facilitate snowplowing).

8

Reserved Way. The Voncannons' and the Rogerses' predecessors-in-title did not, nor did they believe they needed to, seek permission of the Carters or the Carters' predecessors-in-title for these uses, and they openly spoke and behaved as if they each owned half of the Reserved Way.

[¶11] In 1999, the Rogerses' predecessor placed cinderblocks in the middle of the Reserved Way to demarcate what she and the Voncannons' predecessor considered to be the approximate boundary between their properties; more recently, the Voncannons and the Rogerses' predecessor agreed to a precise centerline based in part on land surveys. In 2019, the Carters helped replace the cinder blocks that demarcated the boundary line with stones.

[¶12] The Carters regularly interacted with the Voncannons' and Rogerses' predecessors prior to purchasing their lot in 2010.[7] In his youth, when John Carter was in the area, he often mowed the lawn on the part of the Reserved Way that the Rogerses' predecessor believed was hers. After purchasing the Carter lot, the Carters requested the Rogerses' predecessor's permission before clearing brush or trimming the trees located on the Reserved

---

[7] The court appears to have made a clerical error in its finding that John Carter stayed with the Rogerses' predecessor and her family. John Carter testified at trial that the Carters were regular guests of the *Voncannons'* predecessor.

Way and stopped doing so when that permission was withdrawn. Over the last ten years, the Carters also made some limited use of the Reserved Way as a path, mostly after being invited to do so by the Voncannons' or the Rogerses' predecessors-in-title.

## C.     Usage of Austin Avenue

[¶13]  Austin Avenue has been, for most of its existence, an overgrown, natural hedge between various properties. The Ells deed described Austin Avenue as "not being opened and used." As far back as the late 1960s, the Voncannons' and the Rogerses' predecessors considered Austin Avenue their property to the centerline. Beginning in 2016, the Voncannons' and the Rogerses' predecessors cleared some of the brush so that they could use their part of Austin Avenue for planting lawns, shrubs, and flowers. Prior to these improvements, the Voncannons had made some use of Austin Avenue by mowing portions of it and maintaining a fenced-in compost pile.

[¶14]  When the Carters began clearing the hedges, also in 2016, they marked the centerline of Austin Avenue with stakes and directed their son to clear the brush only to the west of those stakes. The Carters asked for the Rogerses' predecessor's permission before trimming trees beyond the center line of Austin Avenue. The Carters also assisted their neighbors in locating the centerline, as John Carter had measured it, and marked it with stones and

10

stakes. Then, in 2020, the Carters claimed that they owned the entirety of Austin Avenue.

## D.     Procedural History

[¶15]  The Carters filed a complaint in the Superior Court on August 10, 2020, and the case was transferred to the Business and Consumer Docket on January 8, 2021. The Carters' second amended complaint, filed on September 5, 2020, named the Voncannons, the Rogerses, and two other families as defendants and set forth five counts. The second amended complaint included a petition for declaratory relief, a claim for trespass, a claim for slander of title, a petition to quiet title, and a claim for nuisance. The defendants filed an answer and counterclaims on November 19, 2020, and filed an amended answer and numerous counterclaims on February 5, 2021. The counterclaims included a petition to quiet title and requests for declaratory relief as to the ownership of the Reserved Way and Austin Avenue, claiming that they owned portions of those streets based on the doctrines of adverse possession, boundary by acquiescence, boundary by parol agreement, boundary by practical location, prescriptive easement, implied easement, or some combination of these doctrines. In a second amended counterclaim filed on May 20, 2021, the defendants added another counterclaim seeking a judgment declaring that they had deeded title to portions of the paper streets.

[¶16]  The Carters settled their claims against the parties other than the Voncannons and the Rogerses at a judicial settlement conference on February 22, 2022.  The court then held a five-day bench trial on March 21-25, 2022, to address the remaining claims.  After receiving post-trial briefs from the parties, the court issued its judgment, entering judgment in part on the Carters' claims and entering judgment in part on the Voncannons' and Rogerses' counterclaims.

[¶17]  The Court made several findings.  First, the court determined that the Carters had full record title to Austin Avenue and that the Voncannons' and Rogerses' activities on Austin Avenue constituted trespass.  Second, after noting that the precise location of the Emery line is ambiguous and, consequently, so is the location of the northeast corner of the Voncannon lot (which is also the intersection of Holiday Beach Road and the Reserved Way), the court found that a survey by James Dorsky[8] accurately reflects the location of the record Emery line, which was a straight line, and the Voncannon lot.  Third, after concluding that the Carter deed is ambiguous as to the terminus of the Reserved Way, the court determined that the Reserved Way terminates at Holiday Beach Road and does not extend to the high-water mark of Owls Head Harbor.  Finally, the court

---

[8]  The Dorsky survey is a boundary survey dated July 1, 2020, and revised March 1, 2022, entered in evidence at trial.  The court heard expert testimony from Dorsky.

concluded that the Carter deed conveyed the Reserved Way to the Carters, but that the Voncannons and the Rogerses had acquired title to the Reserved Way by adverse possession.[9]  The court declared that the Voncannons acquired title to the southern half of the Reserved Way and that the Rogerses acquired title to the northern half of the Reserved Way.

[¶18]  The Carters filed a notice of appeal on August 31, 2022, and we dismissed the appeal for lack of a final judgment.  The court later granted the Carters' motion for entry of final judgment on December 12, 2022.  The Carters timely appealed, alleging that the trial court erred by concluding that the Reserved Way does not extend to the high-water mark of Owls Head Harbor and by awarding title to half of the Reserved Way to the Voncannons and the other half to the Rogerses based on a theory of adverse possession.  The Voncannons and Rogerses timely cross-appealed, alleging that the trial court erred by denying their claims for title to half of Austin Avenue based on alternate theories of boundary by parol agreement, practical location, or acquiescence.

---

[9]  The Carters did not dispute either that the Voncannons and the Rogerses have an implied right to continue to use the Reserved Way for the limited purposes of parking and access to their homes or that the Voncannons have ownership of the portion of the Reserved Way on which a portion of their house sits.

## II. DISCUSSION

**A.** **Southwestern Corner of Holiday Beach Road and the Reserved Way (Northeastern Corner of Voncannon Lot)**

[¶19] The Voncannons and Rogerses contend that the court clearly erred in determining the location of the southwestern corner of Holiday Beach Road and the Reserved Way, which now serves as the northeastern corner of the Voncannon lot. They argue that the court misapprehended the location of the record Emery line when it concluded that the Emery line extends straight along a single bearing from its point of beginning at the intersection with Holiday Beach Road.

[¶20] "Determination of where the boundary lies on the surface of the earth is a question of fact that we review for clear error. A finding of fact is clearly erroneous when[] (1) no competent evidence supporting the finding exists in the record; (2) the fact-finder clearly misapprehended the meaning of the evidence; or (3) the force and effect of the evidence, taken as a whole, rationally persuades us to a certainty that the finding is so against the great preponderance of the believable evidence that it does not represent the truth

14

and right of the case." *Wells v. Powers,* 2005 ME 62, ¶ 2, 873 A.2d 361 (citation omitted).

[¶21]  The court thoughtfully weighed expert testimony, examined language in the Pierce deed, and reviewed historical documents to support its conclusion that the Dorsky Survey, as revised March 1, 2022, accurately reflects the location of the record Emery line and, consequently, the southwestern corner of Holiday Beach Road and the Reserved Way.  Contrary to the Voncannons and Rogerses' argument, we discern no clear error in the court's determination.

## B.    Terminus of the Reserved Way

[¶22]  The Carters claim that the Carter deed's description of the Reserved Way unambiguously includes the land up to the high-water mark, and that even if the Carter deed is ambiguous, extrinsic evidence of the grantor's intent—namely the grantor's description, in an unrelated deed, of the Reserved Way's terminus—supports their position.  The Voncannons and Rogerses contend that the Carter deed contains a patent ambiguity because the deed indicates that the Reserved Way ends at two different points—"Ocean Drive" and "the shore"—and urge the use of extrinsic evidence, in particular the Tripp plan and the Flint deed, to conclude that the Reserved Way ends at the western boundary of Holiday Beach Road.

[¶23]  We "review de novo the interpretation of a deed and the intent of the parties who created it, including whether the deed contains an ambiguity." *Mabee v. Nordic Aquafarms Inc.*, 2023 ME 15, ¶ 26, 290 A.3d 79 (quotation marks omitted).  "When interpreting a deed whose terms are not ambiguous, we do not speculate about the grantors' actual or probable objectives; rather, we focus on what is expressed within the four corners of the deed." *Sleeper v. Loring*, 2013 ME 112, ¶ 16, 83 A.3d 769.  The "four corners of the deed" includes the entirety of plans referenced by the deed. *Id.* ¶ 13.

[¶24]  A deed is patently ambiguous if, within the four corners of the deed, there are multiple reasonable interpretations of the language. *Beckman v. Conant*, 2017 ME 142, ¶ 13, 166 A.3d 1006.  We may resolve a patently ambiguous deed by examining the deed itself, the circumstances of the grant, and the intentions of the parties. *See Barron v. Boynton*, 137 Me. 69, 71-72, 15 A.2d 191, 193 (1940).

[¶25]  The language conveying the Reserved Way in the Carter deed states,

> ALSO, all my right, title and interest in and to [the Reserved Way] delineated on the aforesaid O.H. Tripp plan which extends from Austin Avenue, at a point opposite the line dividing Lot #4 and Lot #5 aforesaid, *to [Holiday Beach Road] and the shore,* said reserve not being opened and used.

(Emphasis added.)

[¶26] "'To' is a word of exclusion. A line running 'to' an object excludes that object." *Mabee*, 2023 ME 15, ¶ 32, 290 A. 3d 79 (quotation marks, citation, and alteration omitted). The term "shore" refers to "the land lying between the lines of the high water and low water over which the tide ebbs and flows." *Almeder v. Town of Kennebunkport*, 2019 ME 151, ¶ 8, 217 A.3d 1111 (quotation marks omitted).

[¶27] We first review whether the Carter deed's description of the Reserved Way is ambiguous. The deed describes the Reserved Way as beginning at Austin Avenue and extending "to [Holiday Beach Road] and the shore." The deed language is ambiguous—that is, subject to multiple reasonable interpretations—because it is unclear whether the Reserved Way ends at the eastern boundary of Holiday Beach Road or extends over Holiday Beach Road to terminate at the eastern boundary of the shore. Because the deed language is ambiguous as to the terminus of the Reserved Way, we must construe the grant. *See McLellan v. McFadden*, 114 Me. 242, 246, 95 A. 1025, 1028 (1915). "In construing the grant we are to give effect, if possible, to the intention of the parties, so far as it can be ascertained in accordance with legal canons of interpretation." *Id.* Here, the grantor's intent is manifested most clearly in the first clause of the conveyance: "ALSO, all my right, title and interest in and to [the Reserved Way] delineated on the aforesaid O.H. Tripp

plan . . . ." Our interpretation of the grant terminating at the western side of Holiday Beach Road coheres with the conveyor's intent to convey land for a road that would connect what is now the Carter lot with Holiday Beach Road; any interpretation of the deed as conveying land *beyond* Holiday Beach Road to the high-water mark would be contrary to an ordinary reading of the language of the transfer.

[¶28]    Two pieces of historic extrinsic evidence support this interpretation: first, the deed's reference to the Tripp plan, which depicted the Reserved Way as a planned road extending from the Carter lot toward Holiday Beach Road; and second, the Flint deed, which included the first recorded description of the Reserved Way and described the road as "running westerly from [Holiday Beach Road]."[10]  The court therefore correctly determined that the Reserved Way terminates at its intersection with Holiday Beach Road and does not extend to the high-water mark.

C.    **Adverse Possession of the Reserved Way**

[¶29]  The Carters argue that the court erred as a matter of law by determining that the Voncannons and Rogerses had each obtained title by

---

[10] The Flint deed made no reference to the shore or land east of what is now Holiday Beach Road.

18

adverse possession to the centerline of the Reserved Way adjacent to their respective properties.

[¶30]  "Adverse possession presents a mixed question of fact and law." *Fissmer*, 2019 ME 130, ¶ 40, 214 A.3d 1054.  We "review a trial court's factual findings regarding adverse possession for clear error and will affirm those facts if they are supported by competent record evidence." *Id.*  In cases like the one before us, where no party has moved for additional findings of fact pursuant to M.R. Civ. P. 52(b), "we will infer that the court made all findings necessary to support its conclusions."  *Weeks v. Krysa,* 2008 ME 120, ¶ 11, 955 A.2d 234; *D'Angelo v. McNutt,* 2005 ME 31, ¶¶ 6, 8, 868 A.2d 239.[11]  Whether the express findings and the inferred findings necessary to the court's conclusions, supported by competent record evidence, constitute adverse possession is an issue of law that we review de novo.  *See Fissmer*, 2019 ME 130, ¶ 40, 214 A.3d; *Weeks*, 2008 ME 120, ¶ 11, 955 A.2d 234.

[¶31]  "A party claiming title by adverse possession has the burden of proving, by a preponderance of the evidence, that possession and use of the

---

[11]  In these cases, which were decided prior to the 2014 amendments to M.R. Civ. P. 52, parties relied on Rule 52(a) to request that the court make additional findings of fact.  *See Weeks v. Krysa,* 2008 ME 120, ¶ 11, 955 A.2d 234; *D'Angelo v. McNutt,* 2005 ME 31, ¶¶ 6, 8, 868 A.2d 239; M.R. Civ. P. 52 Advisory Note — June 2014.  Parties requesting amended or additional findings now do so pursuant to Rule 52(b).

property was (1) actual; (2) open; (3) visible; (4) notorious; (5) hostile; (6) under a claim of right; (7) continuous; (8) exclusive; and (9) for a duration exceeding the twenty-year limitations period." *Fissmer*, 2019 ME 130, ¶ 41, 214 A.3d 1054 (quotation marks omitted). "The elements of adverse possession must be established by clear proof of acts and conduct sufficient to put a person of ordinary prudence, and particularly the true owner, on notice that the land in question is actually, visibly, and exclusively held by a claimant in antagonistic purpose." *Weeks*, 2008 ME 120, ¶ 13, 955 A.2d 234 (quotation marks omitted).

[¶32] The dispute in this case is whether the Voncannons' and Rogerses' uses of the Reserved Way were actual, hostile, under a claim of right, and exclusive; if any one of these elements is not met, their claim of adverse possession fails. *See Fissmer*, 2019 ME 130, ¶ 41, 214 A.3d 1054; *Me. Gravel Servs., Inc. v. Haining*, 1998 ME 18, ¶ 3, 704 A.2d 417 (requiring that all elements of possession and use be satisfied "for a period of at least twenty years" to prove adverse possession).

[¶33] In the context of adverse possession, "'[h]ostile' simply means that the possessor does not have the true owner's permission to be on the land, and has nothing to do with demonstrating a heated controversy or a manifestation of ill will, or that the claimant was in any sense an enemy of the owner of the servient estate." *Dombkowski v. Ferland*, 2006 ME 24, ¶ 12, 893 A.2d 599

(quotation marks omitted). Hostile activities by a possessor must be undertaken to dispossess the true owner of property rights. *See Cent. Me. Power Co. v. Rollins*, 126 Me. 299, 301-02, 138 A. 170, 172-73 (1927). However, any use that falls within a possessor's legal entitlement is not considered hostile for the purpose of proving adverse possession. *See Mill Pond Condo. Ass'n v. Manalio*, 2006 ME 135, ¶ 9, 910 A.2d 392.

[¶34] The conduct that constitutes hostile use is specific to the land in question and the attendant circumstances. *Weeks*, 2008 ME 120, ¶ 13, 955 A.2d 234. For instance, using a true owner's undeveloped land for recreational activities and access to a stream and to other lots is not sufficient to prove hostility. *Id.* ¶ 17. "[S]easonal playing on and crossing over a [disputed] lot" and occasionally gardening on a disputed lot are not hostile activities because they do not put a true owner on notice that the owner's property rights are in jeopardy. *See id.* ¶¶ 17-18; *Falvo v. Pejepscot Indus. Park, Inc.*, 1997 ME 66, ¶ 8, 691 A.2d 1240.

[¶35] The Carters contend that the Voncannons and the Rogerses hold an implied access easement over the Reserved Way.[12] *See Beckwith v. Rossi,* 157 Me. 532, 535-37, 175 A.2d 732, 735 (Me. 1962); *LeMay v. Anderson*, 397 A.2d

---

[12] The trial court order also indicates that the slight physical encroachment of the Voncannons' home onto the Reserved Way is not disputed by the Carters, and no party raised this issue on appeal.

984, 987-88 (Me. 1979). "[P]ermission, either express or implied, negates the element of hostility . . . ." *Hamlin v. Niedner*, 2008 ME 130, ¶ 12, 955 A.2d 251. Thus, an implied easement for the benefit of the Voncannons and the Rogerses to use and maintain the Reserved Way for access to their lots would not be hostile to the Carters. *See Mill Pond Condo. Ass'n,* 2006 ME 135, ¶ 9 910 A.2d 392.

[¶36] "We have recognized two types of implied easements: implied easements by necessity and implied easements created by, or arising from, a prior quasi-easement." *Northland Realty, LLC v. Crawford*, 2008 ME 92, ¶ 12, 953 A.2d 359. An easement by necessity is created when

> a grantor conveys a lot of land from a larger parcel, and that *conveyed* lot is "landlocked" by the grantor's surrounding land and cannot be accessed from a road or highway. Because of the strict necessity of having access to the landlocked parcel, an easement over the *grantor's remaining land* benefitting the landlocked lot is implied as a matter of law irrespective of the true intent of the common grantor.
>
> . . . [W]e have consistently stated that the creation of an easement by necessity depends on three elements: (1) the conveyance of a lot out of a larger parcel; (2) a lack for all practical purposes of access to the *conveyed lot;* and (3) the availability of relief in the form of an easement across the *retained land* of the conveyor or the conveyor's successor in title. The creation of an easement by necessity does not depend on any preexisting use of the land or on the intent of the grantor at the time of the conveyance.

*Id.* (citations and quotation marks omitted).

22

[¶37] By contrast, "the creation of an implied easement by a prior quasi-easement depends on [] a preexisting use of the land," the intent of the grantor at the time of conveyance, and, following the severance, the use of the retained land by the grantee through what was a quasi-easement as a true easement. *Id.* ¶ 13. An implied easement by a prior quasi-easement arises when:

> (1) the property when in single ownership [was] openly used in a manner constituting a "quasi-easement," as existing conditions on the retained land that are apparent and observable and the retention of which would clearly benefit the land conveyed; (2) *the common grantor, who severed unity of title, . . . manifested an intent that the quasi-easement should continue as a true easement, to burden the retained land and to benefit the conveyed land*; and (3) the owners of the conveyed land . . . continued to use what had been a quasi-easement as a true easement.

*Id*. (emphasis added) (quotation marks and citations omitted).

[¶38] Here, the Voncannons, the Rogerses, and their predecessors-in-title do not have an implied easement by necessity because they do not have a lack "for all practical purposes" of access to their lots. *See id*. ¶ 12 (quotation marks omitted). Both lots have frontage on Holiday Beach Road and could be reached via that public road without using the Reserved Way. *See id*. In fact, prior to 1980, the Voncannons' predecessors did not use the Reserved Way for ingress and egress between their lot and Holiday Beach Road.

[¶39]  The determination of a prior quasi-easement is dependent upon the demonstration of (a) the use of the land before severance of the unity of title, (b) the intent of the grantor when the severance occurred, and (c) the grantee's continued use of the grantor's land following the severance. *Id.* ¶ 13. The record here demonstrates that Pierce intended to retain the fee title to the Reserved Way, as it was never conveyed to any of the abutters by Pierce or by any of his successors in title.  The record in this case does not indicate the use made of the Reserved Way prior to 1884, when Pierce conveyed to Flint and Williams the properties that are now part of the Voncannons' and Rogerses' respective lots.  It does not reflect that Pierce intended for the land he retained to continue to be used for some quasi-easement that existed before the severance of title.  Nor does the record establish that after the conveyances to Flint and Williams the land retained by Pierce was subject to continued use by the grantees for a quasi-easement that existed previously.  On this record, the Voncannons and the Rogerses would not have an implied easement to use the Reserved Way for access. *See id.* ¶ 15 (where there is no evidence of grantor's intent to retain a quasi-easement, the proper conclusion is that no implied easement has been created); *see also Frederick v. Consol. Waste Servs., Inc.*, 573 A.2d 387, 389-390 (Me. 1990) (concluding that because the lot created when the unity of title was severed had access to a town way, there was a strong

24

suggestion that the grantor had no reason, and thus no intent, to create an implied easement over the grantor's retained land to benefit the new lot).

[¶40]  Contrary to the Carters' contention, the Voncannons, the Rogerses, and their predecessors did not have either an implied easement by necessity or an implied easement arising from a prior quasi-easement.  In the absence of an implied easement, the Voncannons' and their predecessors' use of the southern half of the Reserved Way for access to their lot since the early 1980s has been hostile to the Carters' fee ownership of the Reserved Way. *See Northland Realty, LLC*, 2008 ME 92, ¶ 18, 953 A.2d 359.  Without the benefit of an implied easement, the Rogerses' and their predecessors' use of the northern half of the Reserved Way for access to their lot since the 1930s has been hostile to the Carters' fee ownership of the Reserved Way. *See id*.  Similarly, any maintenance or demarcation of the Reserved Way to facilitate the Voncannons', the Rogerses', and their predecessors' access to their respective lots also would be hostile to the Carters. *See id*.

[¶41]  The Voncannons, the Rogerses, and their predecessors also used the western portion and nongraveled eastern portion of the Reserved Way as part of their respective yards, including by planting trees, pruning tree limbs, installing and mowing lawns, landscaping, planting and maintaining flower and vegetable gardens, composting, picnicking, and storage.  The Voncannons,

Rogerses, and their predecessors did not seek permission from the Carters or their predecessors-in-title for their use of the Reserved Way. This open conduct by the Voncannons, Rogerses, and their predecessors, combined with the obvious physical manifestations of such use, demonstrated a hostile intention sufficient to give notice to the Carters, and their predecessors-in-title, that their rights to the Reserved Way were in jeopardy. *See Weeks*, 2008 ME 120, ¶ 13, 955 A.2d 234. We conclude that the Voncannons' and Rogerses' and their predecessors' use of Reserved Way was hostile to the true owners—the Carters and their predecessors.

[¶42] The Carters also contend that the court erred by awarding ownership of portions of the Reserved Way to the Voncannons and the Rogerses without record evidence of actual occupation of those portions of the Reserved Way by them. "Actual possession means physical occupancy or control over property" and "is established when the evidence shows an actual use and enjoyment of the property that is in kind and degree the same as the use and enjoyment to be expected of the average owner of such property." *Fissmer*, 2019 ME 130, ¶ 42, 214 A.3d 1054 (citation omitted). As noted *supra* ¶¶ 9, 10, 41, the Voncannons, the Rogerses, and their predecessors-in-title have used, traversed, improved, maintained, and demarcated their halves of the Reserved Way from where it abuts their respective lots to its centerline. Thus,

we agree with the trial court that their use, occupancy, and control of their respective halves of the Reserved Way was actual. *See Fissmer*, 2019 ME 130, ¶ 44, 214 A.3d 1054.

[¶43] The Carters further argue that the court erred as a matter of law by determining that the Voncannons and Rogerses jointly demonstrated exclusive use and possession of the Reserved Way because "[t]here is no authority to support the proposition that multiple parties can jointly use or occupy land to obtain title by adverse possession . . . ." "'Exclusive' possession and use means that the possessor is not sharing the disputed property with the true owner or public at large." *Striefel v. Charles-Keyt-Leaman P'ship*, 1999 ME 111, ¶ 17, 733 A.2d 984.

[¶44] The record evidence reflects that the Voncannons, the Rogerses, and their predecessors-in-title at times disputed where the centerline of the Reserved Way abutting their lots was located but resolved these disputes with the assistance of surveyors. The record evidence further suggests that the Voncannons, the Rogerses, and their predecessors-in-title on occasion gave others, including the neighbor in possession of the other half of the Reserved Way, permission to use or help maintain their half of the Reserved Way. *See Grimstad v. Dordan*, 471 P.2d 778, 781 (Or. 1970) (holding that possession of property in regard to an adverse possession claim does not have to be

absolutely exclusive if the possession is of the kind expected of an owner under the circumstances, such that a disseisor may give permission to others to make some use of the subject property); *Bensdorff v. Uihlein*, 177 S.W. 481, 483 (Tenn. 1915) (holding that mere use of property with the permission of the disseisor will not destroy the disseisor's adverse possession claim); *Peveto v. Herring*, 198 S.W.2d 921, 925 (Tex. Civ. App. 1946) (holding that use of a lot by others in subordination to disseisor's claim and made with disseisor's consent does not affect the exclusiveness of disseisor's possession). The Voncannons, the Rogerses, and their predecessors-in-title did not share their portions of the Reserved Way with each other, the true owner, or the public at large. *See Striefel*, 1999 ME 111, ¶ 17, n.10, 733 A.2d 984 ("Exclusive possession by [an] adverse possessor means that [the] adverse possessor must show an exclusive dominion over the land and an appropriation of it for his own use and benefit, and not for another" (quotation marks omitted)). The record does not reflect that the Voncannons, the Rogerses, or their predecessors-in-title made a claim of possession or ownership beyond the agreed-upon centerline dividing the Reserved Way. The record thus supports the court's finding that the Voncannons', the Rogerses', and their predecessors' use and possession of their

respective halves of the Reserved Way were exclusive throughout the limitations period.[13] *See id* ¶ 17.

[¶45] Finally, the Carters contend that there is no evidence in the record to support the court's ruling that the Voncannons and the Rogerses were proceeding under a claim of right—that is, they each acted as owner of their respective halves of the Reserved Way. *See Harvey v. Furrow*, 2014 ME 149, ¶ 15, 107 A.3d 604. "Under a claim of right means that the claimant is in possession as owner, with intent to claim the land as [her or his] own, and not in recognition of or subordination to the record title owner." *Id.* Here, there is no legitimate dispute that the Voncannons, the Rogerses, and their respective predecessors have used their halves of the Reserved Way as if they owned them and that their use of their respective halves of the Reserved Way was not undertaken in subordination to the Carters' claim of fee title to the Reserved Way. *See id.*

[¶46] We therefore affirm the court's judgment that the Voncannons and the Rogerses each adversely possessed the half of the Reserved Way abutting

---

[13] To the extent that the Rogerses traveled over the part of the Voncannons' half of the Reserved Way to access their garage, that use was both with the Voncannons' permission and de minimis.

their respective lots.  *See Northland Realty, LLC*, 2008 ME 92, ¶ 20, 953 A.2d

359.[14]

_____

[14]  The Carters make two additional arguments as to why the Voncannons do not own the southern half of the Reserved Way and the Rogerses do not own the northern half of the Reserved Way.  The Carters contend that the Reserved Way is a proposed, unaccepted way over which the Voncannons, the Rogerses, and their respective predecessors hold an easement by estoppel as the source deeds in their respective chains of title describe their lots as bounded by the Reserved Way and thus afford them a private right-of-way over the Reserved Way.  *See Frederick v. Consol. Waste Servs., Inc.*, 573 A.2d 387, 390 n.4 (Me. 1990) ("We have recognized under a theory of estoppel that easements may be created by implication when a grantor's conveyance describes land as bounded by a street or road.").  In addition, they note that the Reserved Way is shown on the recorded Tripp plan as a proposed, accepted way and likely confers a private right-of-way over the Reserved Way to the owners of lots shown on the plan.  23 M.R.S. § 3031(2) (2024) ("A person acquiring title to land shown on a subdivision plan recorded in the registry of deeds acquires a private right-of-way over the ways laid out on the plan.").  The Carters maintain that for these reasons, the use of the Reserved Way by the Voncannons, the Rogerses, and their predecessors-in-title negates the element of hostility and precludes their acquisition of title by adverse possession.  *See Mill Pond Condo. Ass'n v. Manalio*, 2006 ME 135, ¶ 9, 910 A.2d 392 (concluding that if a claimant's use and maintenance of land are consistent with the claimant's rights of access over that land, there is no hostility for the purposes of an adverse possession claim).

We find these arguments unpersuasive.  Even if the Voncannons and the Rogerses were afforded a right of way over the Reserved Way, as noted *supra* ¶¶ 9, 10, 41, the Voncannons, the Rogerses, and their predecessors used the western portion and nongraveled eastern portion of the Reserved Way for far more than a simple right of way.  They did not seek the permission of the Carters or their predecessors-in-title in regard to that use, which was open and obvious, such that it sufficiently demonstrated a hostile intention to the Carters and their predecessors.

Moreover, pursuant to section 3032, a proposed, unaccepted way or portion of a proposed, unaccepted way laid out on a subdivision plan recorded prior to September 29, 1987, is deemed vacated if, as in this case, "by the later of 15 years after the date of the recording of the subdivision plan laying out the way or portion of the way or September 29, 1997, both of the following conditions have been met: (A) The way or portion of the way has not been constructed or used as a way; and (B) The way or portion of the way has not been accepted as a town, county or state way or highway or as a public, utility or recreational easement.  A way or portion of a way considered vacated under this subsection is subject to section 3033."  23 M.R.S. § 3032(1-A) (2024).  Pursuant to section 3033, a person claiming ownership of a proposed, unaccepted way deemed vacated under section 3032 may record in the registry of deeds a notice of the claim and must mail any recorded notice to the current record owners and mortgagees of the lots in the subdivision.  23 M.R.S. § 3033(1) (2024).  Once they receive such notice, all persons who claim any private right of any kind in the way are forever barred from maintaining any action regarding their rights unless they file a statement, under oath, of any claimed interest in the way in the registry of deeds within one year from the date of recording of the notice.  *Id.* at § 3033(2).  Based on the record, it seems that none of the parties recorded, sent notice of, or filed an appropriate statement of claimed interest in the registry of deeds.  Therefore, we apply the second paragraph of section 3031(2), which we have held applies retroactively to conveyances prior to 1987, *see Carignan v. Dumas*, 2017 ME 15, ¶ 19, 154 A.3d 629, to conclude that the title of the

30

## D.     Rights to Austin Avenue

[¶47]   The Voncannons and Rogerses cross-appeal and argue that the court erred when it determined that the evidence was insufficient to prove that the western boundary lines of their respective properties extended to the centerline of Austin Avenue by parol agreement, practical location, or acquiescence.   The doctrines of boundary by parol agreement, practical location, and acquiescence are common-law concepts drawn from the principle of estoppel, though each requires slightly different showings.   *See generally*

---

fee interest passes to the Voncannons and the Rogerses, each to the centerline of the way: "when the private rights established by this subsection are terminated as provided in this subsection or by order of vacation by the municipality, the title of the fee interest in the proposed, unaccepted way for which the private rights-of-way have terminated passes to the abutting property owners to the centerline of the way."  23 M.R.S. § 3031(2) (2024).

For any conveyance made before September 29, 1987, which conveyed land abutting a proposed, unaccepted way on a recorded subdivision plan, section 469-A requires the grantor to expressly reserve the grantor's title to the way by a specific reference to the reservation of title in the deed of conveyance, otherwise the grantor will be deemed to have conveyed all of the grantor's interest in the portion of the way abutting the conveyed land.  33 M.R.S. § 469-A(1) (2024).

For any conveyance made before September 29, 1987, which conveyed land abutting a proposed, unaccepted way on a recorded subdivision plan, where the grantor intended to reserve the grantor's title to the way but did not expressly reserve title in the deed of conveyance, section 469-A requires the grantor, or any person claiming title to the way, by, through, or under the grantor, to preserve the grantor's claim by recording a notice in the registry of deeds where the plan is recorded by September 29, 1989, otherwise the grantor will be deemed to have conveyed all of the grantor's interest in the portion of the way abutting the conveyed land.  33 M.R.S. § 469-A(2).

The record in this case does not reflect that the Reserved Way was ever accepted by the Town of Owls Head or constructed in accordance with section 3032(1-A), that any of the parties pursued an interest in the Reserved Way in accordance with section 3033, that the deeds in the chains of title to the Voncannons and the Rogerses contained the express reservation of title to the Reserved Way required by section 469-A(1), or that the notice required by section 469-A(2) was ever recorded in the registry of deeds. Thus, under the Carters' contentions, the fee title to the Reserved Way passed to the Voncannons' and the Rogerses' predecessors-in-title pursuant to section 469-A(2).

George L. Blum, Annotation, *Application of Practical Location Doctrine in Establishing Boundary Line*, 91 A.L.R.6th 1 (2014). Determination of the location of a boundary under any of these theories is a question of fact that we review for clear error. *See Dupont v. Randall*, 648 A.2d 437, 438 (Me. 1994) ("The parties did not dispute the legal boundary; they disputed the location of that boundary and in such a case a factual finding will not be disturbed on appeal unless it is clearly erroneous."); *Calthorpe v. Abrahamson*, 441 A.2d 284, 288 (Me. 1982).

[¶48] "[W]here parties are in doubt as to where the true division line [] of their lands may be, they may fix it by parol agreement which would be mutually binding on them." *Steinherz v. Wilson*, 1998 ME 22, ¶ 13, 705 A.2d 710 (quotation marks omitted). In contrast, boundary by practical location requires only a mutual understanding that a boundary is being created in combination with the establishment of physical markers on the face of the earth, like erecting a fence or building monuments. *See Proctor v. Libby*, 110 Me. 39, 42, 85 A. 298, 299 (1912); *Little Ossipee River Dev. v. White Bros., Inc,* No. Civ.A. RE-03-78, 2005 WL 3678035, at *3-5 (Me. Super. Ct. Nov. 28, 2005); 2 *Tiffany Real Property* § 655 (3d ed. 2023). To find a boundary by acquiescence, a party must prove by clear and convincing evidence "(1) possession up to a visible line marked clearly by monuments, fences or the like; (2) actual or constructive

notice to the adjoining landowner of the possession; (3) conduct by the

adjoining landowner from which recognition and acquiescence not induced by

fraud or mistake may be fairly inferred; (4) acquiescence for a long period of

years such that the policy behind the doctrine of acquiescence is well-served by

recognizing the boundary." *Calthorpe*, 441 A.2d at 289.  Unlike boundary by

parol agreement and practical location, acquiescence does not require proof of

agreement or mutual understanding.  *See id.*

> [¶49]  Here, the court found, supported by competent evidence, that

> as far back as the late 1960s, the owners of the Vo[n]cannon lot
> considered [Austin Avenue] their property to the centerline, as did
> the Rogers[es'] predecessor[-]in[-]title.  When [John] Carter began
> clearing brush in 2016, he believed he only had rights on the west
> half, so he first measured to Austin Avenue's centerline, marked it
> with stakes, and directed his son to only clear brush on the west
> side. He asked permission from [the Rogerses' predecessor] before
> trimming trees beyond the centerline.  [John] Carter assisted his
> abutting neighbors—the Voncannons, Graners, and [the Rogerses'
> predecessor]—in locating the centerline, as he had measured it,
> and the[n] marking it with stones and stakes.  The neighbors
> cleared some brush as well so they could also use Austin Avenue
> for planting lawns, shrubs, and flowers.  Prior to these activities,
> which began in 2016, the Voncannons had made some use of Austin
> Avenue by maintaining a fenced in compost pile and mowing
> portions of it.  It was only in 2020, in the leadup to the instant
> action, that [John] Carter expressed his belief that his family owned
> both halves of Austin Avenue.

There were no findings of an oral agreement to change the location of the

boundary, nor a mutual understanding that the boundary was changed.  The

court also found no clear and convincing evidence that the Carters or their predecessors-in-title acquiesced to the centerline of Austin Avenue being the boundary of their property for a long period of years, noting that, prior to the Carters creating a visible line by placing stakes at the centerline in 2016, Austin Avenue was an overgrown, natural hedge. The court thus did not clearly err in determining that the Voncannons and Rogerses do not have possession of Austin Avenue through boundary by practical location, parol agreement, or acquiescence.

### III. CONCLUSION

[¶50] We therefore affirm the judgment awarding the southern half of the Reserved Way to the Voncannons and the northern half of the Reserved Way to the Rogerses because we determine that they fulfilled each of the necessary elements of adverse possession. We also affirm the judgments determining that the location of the southwestern corner of Holiday Beach Road and the Reserved Way is accurately reflected by the revised Dorsky survey, that the Reserved Way does not extend to the high-water mark of Owls Head Harbor, and that the Voncannons and Rogerses did not establish title to any part of Austin Avenue under any common-law theory.

The entry is:

Judgment affirmed.

---

Gordon R. Smith, Esq. (orally), and Keith E. Glidden, Esq., Verrill Dana, LLP, Portland, for appellants John M. Carter and Christine C. Carter

David A. Soley, Esq. (orally), and Glenn Israel, Esq., Bernstein Shur, Portland, and Joseph L. Cahoon, Jr., Esq., Richardson, Whitman, Large & Badger, Portland, for cross-appellants Michael Voncannon and N. Kermit Voncannon

Christopher E. Pazar, Esq., Drummond & Drummond, LLP, Portland, for cross-appellants Zachary Rogers and Kathryn Rogers as Trustees of the Nancy C. Rogers Irrevocable Trust

Business and Consumer Court docket number REA-2021-1
FOR CLERK REFERENCE ONLY